779 So.2d 950 (2001)
Mary and Lloyd FUSILIER Individually and as Legal Guardians of the Minor Child Lloyd Fusilier, III
v.
Edward W. DAUTERIVE, Jr., M.D, et al.
No. 99-00692.
Court of Appeal of Louisiana, Third Circuit.
January 10, 2001.
*951 J. Minos Simon, J. Minos Simon, Ltd., Counsel for Plaintiff-Appellant.
Marc W. Judice, Judice & Adley, Lafayette, LA, Counsel for Defendant-Appellee, Dr. Edward W. Dauterive, Jr.
Mr. Peter T. Dazzio, Watson, Blanche, Wilson & Posner, Baton Rouge, LA, Counsel for Defendant Iberia General Hospital.
Court composed of SAUNDERS, PETERS, and GREMILLION, Judges.
SAUNDERS, Judge.
Mary Fusilier, Lloyd Fusilier Sr., Mary Fusilier's husband, and Lloyd Fusilier III, Mary Fusilier's grandson, brought this medical malpractice action against Iberia General Hospital, Dr. Edward Dauterive, and Dr. Joseph Fernandez, alleging negligence of the physicians when they performed a surgery on Mary Fusilier. The trial court dismissed Dr. Fernandez and Iberia General Hospital on summary judgment, and the jury found no negligence on *952 the part of Dr. Dauterive, hereinafter "Defendant." Plaintiffs appealed this judgment. This court of appeal affirmed the judgment of the trial court. Plaintiffs sought a writ of certiorari. The supreme court granted the writ and held that the jury was manifestly erroneous in concluding that Defendant was not negligent, reversed and remanded to this court for assessment of damages.

FACTS
On November 9, 1990, Defendant performed a laparoscopic cholecystectomy on Mrs. Fusilier at the Iberia General Hospital. After the Defendant had successfully removed the gallbladder, the anesthesiologist noticed blood coming from Mrs. Fusilier's mouth. Defendant opened Mrs. Fusilier's abdomen to determine the source of the bleeding. Defendant discovered that, at some point during the course of the operation, he had perforated Mrs. Fusilier's infra renal aorta. He also realized he had perforated the duodenum and mesentery. In Defendant's attempt to repair these injuries, he punctured Mrs. Fusilier's large intestine and splenic capsule. As a result of the injuries caused by the Defendant, a simple surgical procedure turned into an eight-hour operation. Mrs. Fusilier required 38 units of blood and nine units of plasma before the bleeding could be stopped. Mrs. Fusilier's abdomen was closed, and she was taken to the recovery room in critical condition.
Mrs. Fusilier's postoperative course was very complex. Mrs. Fusilier's congestive heart failure recurred, and she had to be given Atropine to speed up her heart. Blood loss continued over the first weeks of her recovery, requiring intermittent transfusions. A device was placed on her to prevent blood clots in the lungs. She also developed adult respiratory distress syndrome, which required extended ventilatory support. In fact, she was on ventilatory support for five weeks after the surgery. After several failed attempts to wean Mrs. Fusilier from the ventilator, physicians had to perform a tracheotomy, placing a breathing tube into the airway of the trachea. Physicians also inserted a feeding tube into her abdomen to provide for nutrition intake. Mrs. Fusilier had to remain at the Iberia General Hospital until December 24, 1990, when she was finally discharged.
Five days later, on December 29, 1990, Mrs. Fusilier had to return to the hospital. Mrs. Fusilier was readmitted to the Iberia General Hospital because she was suffering from adhesions and herniation with infarct of her small bowel. Dr. Bill Harkrider performed a hemicolectomy wherein half of her large intestine was removed. He also performed a small bowel resection. She remained hospitalized until January 18, 1991. On that date, rather than being sent home, Mrs. Fusilier was transferred to a skilled nursing facility (SNIF), where she remained until February 14, 1991.
Dr. Stokes testified from the hospital record that on January 8, 1991, Mrs. Fusilier experienced an increase in diarrhea. Dr. Stokes also testified that it was the first time he had seen a patient with such a constellation of disorders coming together all at once. Further, Dr. Stokes testified that on May 30, 1991, Mrs. Fusilier suffered from diarrhea and from short bowel syndrome, which he described as a malabsorptive disorder from loss of some of the length of the small intestine. Dr. Stokes testified that on October 3, 1991, Mrs. Fusilier was still experiencing diarrhea four times a day. He attributed the diarrhea to the surgery performed by Defendant.
Dr. Stokes testified that on December 5, 1995, Mrs. Fusilier was experiencing diarrhea, periumbilical pain and hemocult positive stools, which is microscopic loss of blood. Mrs. Fusilier had hemorrhoids caused by her diarrhea which was causing her to lose blood. She also had gastritis.
Dr. Stokes testified that on January 23, 1996, Mrs. Fusilier was still experiencing diarrhea. His diagnosis in January of *953 1998, was "[l]actose intolerance, heartburn, diarrhea, chest pain, dizziness, and weakness." Dr. Stokes further testified that on March 10, 1998, Mrs. Fusilier had "short bowel syndrome, bile salt periumbilical cramping, and superpubic cramping."
Dr. Stokes testified that in October of 1998, Mrs. Fusilier was again admitted to the hospital in an effort to give Mrs. Fusilier some relief for her painful conditions. He finally testified that he would recommend sending Mrs. Fusilier to a tertiary center in Dallas, Texas, where there is a group of physicians who do exclusive diarrhea research.

LAW AND ANALYSIS
Once it has been determined that the trier of fact is clearly wrong, the appellate court is empowered by La.Code Civ.P. art. 2164 to render "any judgment which is just, legal, and proper upon the record on appeal." "In making an initial award of damages at the appellate level, we are not limited to an award of either the lowest or highest amount we would affirm." Savelle v. Heilbrunn, 552 So.2d 52, 59 (La.App. 3 Cir.1989), writ denied, 556 So.2d 1267 (La. 1990). Instead, we set the award in an amount which is just compensation for the damages revealed by the record. Id.

I. AWARD OF DAMAGES.

1. General Damages.
"`General damages' are those which cannot be fixed with pecuniary exactitude; they involve mental or physical pain or suffering, inconvenience, loss of intellectual gratification, or other losses of life or lifestyle which cannot be definitively measured in monetary terms." Craven v. Universal Life Ins. Co., 95-1168, p. 17 (La.App. 3 Cir. 3/6/96); 670 So.2d 1358, 1368, writ denied, 96-1332 (La.9/27/96); 679 So.2d 1355; Boswell v. Roy O. Martin Lumber Co., Inc., 363 So.2d 506 (La.1978).
In their brief, Plaintiffs request an award of general damages in the amount of $500,000.00, plus legal interest from the date of the judicial demand.
Defendant incorrectly alleges that this court can only award general damages in the lowest amount that could have been awarded by a reasonable trier of fact.
In Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1976), the Supreme Court clarified the standard of review in instances in which an appellate court questions the adequacy of the trial court's monetary award. In such instances, the reviewing court may disturb the award only to the extent of raising or lowering it to the nearest point within reasonable discretion. Id. The rule stated in Coco is inapplicable when, as in the instant case, the jury made no award to compensate for injuries resulting from negligence. Mart v. Hill, 505 So.2d 1120 (La.1987). In such circumstance, the appellate court should make a res nova determination of the appropriate total amount of damages to be awarded to the Plaintiff for the injuries sustained. Id.
The Medical Malpractice Act in pertinent part, limits recovery for medical malpractice victims who have been injured by qualified health care providers as follows:
B. (1) The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost.
(2) A health care provider qualified under this Part is not liable for an amount in excess of one hundred thousand dollars plus interest thereon accruing after April 1, 1991, for all malpractice claims because of injuries to or death of any one patient.
La. R.S. 40:1299.42(B)(1) and (2).
This provision limits each health care provider's liability for compensation to $100,000.00. Accordingly, the health care provider in this case, the Defendant, is liable for a maximum of $100,000.00. Any excess amounts between the Defendant's *954 $100,000.00 and the cap of $500,000.00 are paid by the Patient's Compensation Fund.
In awarding general damages we must evaluate each case according to its own particular circumstances. Berthelot v. Leday, 606 So.2d 1 (La.App. 3 Cir.1992). In the instant case, the evidence shows that as a consequence of Defendant's negligent acts Mrs. Fusilier has a lifetime disability.
As previously stated, the injuries that Mrs. Fusilier suffered during the cholecystectomy have caused her constant pain and suffering for more than seven years. The pain and suffering Mrs. Fusilier has been undergoing is permanent. Also, Mrs. Fusilier's postoperative course was extremely complex. Mrs. Fusilier testified with regard to the pain she underwent when she was placed in the intensive care unit, right after the cholecystectomy:
Q. Can you tell the jury what your feelings were? I know you were under medication and other things, but what you can remember about what you were feeling or going through while you were in the intensive care unit, the best you can remember?
A. Yes, I remember ... that I was there was a lot of bleeding. I was passing blood to my mouth, to my nose. I was full of blood. And this is what I had told them. Excuse my manners. I said, "My mouth smells like the poo-poo with all that bleeding," I even asked Dr. Ned why all of this bleeding. He looked down. He said, "Miss Mary, you're gonna be fine." But I asked him why was I still here. I wanted to know.
Q. [During that] time, did they do an operation in which they cut your throat and put a tube into your throat?
A. Yes, they put that tube in my throat. When I waked up, it was horrible with all that tubes and everything. And I asked why all that. They told me, "you've been pretty sick."
While in the intensive care unit, Mrs. Fusilier learned she would have to use a colostomy bag for a period of six months following the cholecystectomy:
Q. Did they alsowhen you finally came to, did you find out that you had a bag on your side where your waste material was going?
A. Yes. I had a feeder bag and a colostomy bag.... They told me ... in six-month time, that I would have to go back to surgery to close it.
Q. Did you require pain medication on a regular basis while you were in the hospital?
A. Oh, yes. I was very much in pain. Yes, I did.
A day after Mrs. Fusilier's cholecystectomy, her daughter, Bernice Lewis, went to see her at the hospital. Mrs. Lewis testified about her mother's medical condition:
[W]hen I went to the intensive care unit, my mom was in there and she didn't really looked like her. She was swollen, had tubes coming from everywhere, all kinds of machines, monitors hooked up. It was just horrible.... [After speaking with Dr. Dauterive] I didn't think she was gonna pull through.
Mrs. Fusilier's son, Floyd Fusilier, also testified regarding his mother's medical condition right after the cholecystectomy:
[I]t was terrifying. It was shocking to see all the tubes, all the machinery, the blood, the swelling. She was like a 300-pound person, and she was never that way. It was just terrifying and shocking. I couldn't even go in the room. I stayed about five minutes, and I left. [Dr. Dauterive] told me [that] her chance of making it was 50-50.
Mrs. Fusilier had to remain at the hospital for about six weeks after the cholecystectomy. Afterwards, Mrs. Fusilier medical condition did not improve:
Q. Can you tell the jury what your condition was like the first time they sent you home before Christmas?
A. I was sick when Dr. Ned came December 24th to my bedside and told me *955 that I would be able to go home for Christmas. And I told him I wasn't feeling good, which I wasn't. I was sick when I left the hospital .... I was in pain, can't walk, or nothing like that.... I went home in an ambulance.... My condition was critical. I couldn't do nothing for myself. I couldn't even get up.... I was in a wheelchair. They had to help me up to my bed. I felt like I was a vegetable. That's the way I felt. And I have never feel good since the operation
Five days later, on December 29, 1990, Mrs. Fusilier had to be readmitted to the hospital due to her severe medical condition:
A. On December 29th, I was screaming and I was hollering and asking for help. My husband called my sister. She came by.... I had fever 104.... [W]hen I got to the [hospital].... I was out really.... I took [medication and went back] home, but it didn't help. I was still crying, suffering, can't eat or drink.... [A]bout 4:00 o'clock that afternoon, I was still burning fever 104... [My sister] called to the hospital, and they told her to rush me in right away.
Q. So that day, you went to the hospital actually twice by ambulance?
A. Oh, yes.
Q. [D]uring that period of time, did you experience problems with diarrhea?
A. Yes, I had diarrhea. And many times, the aid, the nurse, I asked for ... the little toilet ... for me to use on bed and try to get me up. But ... they had to put diapers on me. I was just like a little baby.
She remained hospitalized until January 18, 1991, and was transferred to SNIF, where she remained until February 14, 1991. Mrs. Fusilier testified about the medical care she received there:
Q. So in addition to nursing care, you had occupational or physical therapy? They helped you learn to walk again?
A. Learn to walk, learn to get in bed, and everything. There was a big rail across my bed, and I'd catch myself on the chain. And showed me how to get up and everything, and all that. But I was sick, but I fight for my life because I didn't want to die.
Q. Did you continue to take pain medicines while you were over there?
A. Yes, I did.
Q. All right. Did you continue to have a problem with diarrhea while you were over there?
A. Yes, I did.... I went back home in an ambulance.
After Mrs. Fusilier was released from the hospital in 1991, up to the present time, Mrs. Fusilier has been continuously seeking medical care. Mrs. Fusilier has seen several doctors in an effort to improve her severe health conditions resulting from the injuries caused by the Defendant:
Q. After you go out of the hospital back in 1991 up to the present time, have you seen a number of doctors?
A. Yes, I did. [I] seen [Dr. Michael Alvarez] until last year, 1997. I had an appointment to go back to see him .... but at the same time I was sick, going to Dr. Cousin. I had tests to run.... It was March 15th [of 1997], something like that.... And I couldn't make it. I wind upI was in the hospital. I was suffering with pain in my stomach. I had slipped in the tub. I were bruised. I couldn't hardly walk.... I have never did that before till after the surgery.
Q. Have you continuing seen Dr. Cousin?
A. Oh, yes.
Q. Is your main stomach doctor now Dr. Perry Stokes?
A. Yes, Dr. Stokes....
Q. And he's still treating you in a regular basis?
A. Yes.... In fact, I was in the hospital twice.... That last month and this *956 month. I was having so much diarrhea, suffering with my stomach.... I was asking for help, could they slow it down or do something so it could stop. [I also went to see him] last year because my colon was infected. And then he gave me some antibiotic and some medication to take, which I did.
Q. With regard to Doctor Cousin, do you still see him as your family doctor on a regular basis?
A. Yes, I was supposedI had an appointment to see him, but I didn't go `cause I was sufferingI had problems with my stomach and diarrhea. I couldn'tI couldn't leave the house.
Dr. Stokes testified about the pain that Mrs. Fusilier has undergone since February 14, 1991.
Dr. Stokes testified from the hospital record that on January 8, 1991, Mrs. Fusilier experienced an increase in diarrhea:
Q. [T]he first involvement you had [with the patient] was in February 21?
A. Yes, sir.
Q. [F]rom the very first time you had contact in connection with the care of this patient, you're aware that a diarrhea was a component of her illness?
A. Yes, sir.
Q. [I]s there a notation relative to diarrhea increased at least as of 1-8-91 in the bottom note, please?
A. Yes, it says, "diarrhea increased since contrast from the CAT scan."
Q. [I]f you were contacted relative to a problem with diarrhea in February, then apparently the diarrhea condition that was present in the January period as reflected in those notes had not resolved at least by the time that you were initially consulted on February 21st, 1991?
A. That was the reason for the consult.
Dr. Stokes also testified that it was the first time he had seen a patient with such a constellation of disorders coming together all at once:
Q. And in fact is she the only patient that you've treated that has that myriad of complex problems in the gastrointestinal system, all four: gallblader, stomach opened, small bowel resection, and hemicolectomy to the best of your recollection?
A. To the best of my recollection. We do see patients with multi-factorial diarrhea not uncommonly, but I don't remember that particular constellation of disorders coming together all at once.... She had undergone a gallbladder operation, removal of the right side of her colon, that she had short bowel syndrome, and she's been given Questran and Lactinex to treat this.
Further, Dr. Stokes testified that on May 30, 1991, Mrs. Fusilier suffered from diarrhea, and from short bowel syndrome, which he described as a malabsorptive disorder from loss of some of the length of the small intestine. Dr. Stokes testified that on October 3, 1991, Mrs. Fusilier was still experiencing diarrhea four times a day. He attributed the diarrhea to the cholecystectomy performed by Defendant:
Q. All right. When following that visit did you next have the opportunity to see the patient?
A. She was seen next on October the 3th, same year [1991].
Q. And at that period of time, was the patient according to your records still experiencing diarrhea?
A. My note says her diarrhea is down four times a day. Her diarrhea was secondary to the surgery.
Dr. Stokes testified that on December 5, 1995, Mrs. Fusilier was experiencing diarrhea, periumbilical pain and hemocult positive stools. He testified that a hemocult positive stool is microscopic loss of blood. On December 12, 1995, Dr. Stokes proceeded to scope Mrs. Fusilier's internal organs to determine the source of the blood loss. He found that Mrs. Fusilier was suffering from hemorrhoids. Dr. Stokes testified that the hemorrhoids had *957 very likely developed due to the four bowel movements a day Mrs. Fusilier was experiencing since the surgery. Dr. Stokes also found that Mrs. Fusilier had gastritis.
Dr. Stokes testified that on January 23, 1996, Mrs. Fusilier was still experiencing diarrhea:
Q. [There]'s long office note relative to this visit. What was your assessment as of that visit?.
A. Diarrhea and laceration of the right leg.
Dr. Stokes further testified that Mrs. Fusilier's diarrhea had been continuous since 1991:
Q. [T]he diarrhea which was present way back in 1991, according to what we indicated previously and in your office records, had still persisted for about seven years despite your best efforts as a Board-certified gastroenterologist to get to the bottom of it or to stop it?
A. Yes, sir.
Dr. Stokes's diagnosis in January of 1998, seven years after the cholecystectomy, was "[l]actose intolerance, heartburn, diarrhea, chest pain, dizziness, and weakness." He further testified that on March 10, 1998, Mrs. Fusilier was experiencing "short bowel syndrome, bile salt periumbilical cramping, and superpubic cramping."
Dr. Stokes testified that in October of 1998, he had Mrs. Fusilier admitted to the hospital in an effort to give Mrs. Fusilier some relief for her painful conditions:
Q. And was part of the purpose of the admission for you, as the managing specialist of her gastroenterology complaints, to try and get a handle on this problem which had persisted so long and see if you could develop some type of a treatment plan?
A. Well, that's exactly why we admitted her, to help get a handle on this.
Q. Okay.
A. In the past stool studies had been done, looking for fat in the stool, and it hadn't been found. And with her diarrhea worsening, I wanted to do a metabolic....
Dr. Stokes testified that he would recommend sending Mrs. Fusilier to a tertiary center in Dallas, Texas, where there is a group of physicians who do exclusive diarrhea research:
A. [It] appears that at this stage, eight years down the road, ...[the next stage] we've talked, she and I, about sending her to a reference tertiary center for investigation of her diarrhea ... Just recently, the bowel movements were between one or four for quite a number of years after the surgery, according to the office notes. Just most recently, things seemed to have deteriorated to the point that what we used to do that worked fairly well is no longer working quite as well, historically.
Q. Doctor, the word, tertiary....
A. To a group of physicians that would do diarrhea exclusively in a research sort of facility.
Q. Is there a place in Dallas for that?
A. Yes, sir.... Right. Yes. There is a group of physicians that sub-specialized in this.
Finally, Dr. Stokes also testified about Mrs. Fusilier's current severe health condition:
[O]ne of the things that confused me thatwas she did indeed spill fat in October on the stool studies, which what one might expect, given these several things that affect this. And that was proven. When we reduced fat in the diet and re-added Questran, the diarrhea rates in the hospital, including into the SNIF, went down. So we've been unable to handle this as an outpatient....
In addition to the physical pain Mrs. Fusilier has been suffering, Mrs. Fusilier's life has been drastically changed since the cholecystectomy.
*958 When Floyd Fusilier testified about the changes to his mother's life since the cholecystectomy, he stated:
Q. Can you describe for the jury the best you can the difference between the way your mother is now, her level of activity, what she likes to do, her mental state of mind, how you could explain it in your own words, with what she used to be like before she had the operation?
A. Before she had the operation, she was very active, active in the church, active in social clubs. My wife and I would come down. We would do things together, far as dancing, going out to dinner and eat, just do fun things.
[A]fter the surgery, when we would come down, she was more restricted to the home. She was more homebound. She would refuse to even leave the house because she was not comfortable thatthe fact she couldn't control her bowel movement. She was constantly taking Imodium AD and another medication, Questran or something, which was supposed to control her bowel movement. But, from what I see, it didn't control her bowel movement, because she was always in the bathroom. She wear adult diapers now. She's just afraid to leave the house, because she have no control over her bowel movement. She's embarrassed.... [T]he first day that she had to attend to court, the first thing when I got up and woke her up to go to get ready to attend to court, she said, "Get me a box of Imodium AD before you leave for work". That's how regular it is. That's what she depend on the control her bowel movement. She will not put food in her stomach when she have to know she has to leave the house, because she's afraid if any food is in her stomach that she mightwouldn't be able to control her bowel movement.
Mrs. Fusilier's daughter stated:
Q. [I]n the two or three years before your mom went in the hospital in November of 1990, when you and your husband would come over to visit, what type of social activities or pleasurable activities did you and your husband like to do with your, mom and your now deceased father?
A. We would go out a lot. Me and my mom would go shopping a lot, go to parties, balls. She was in different types of clubs.... She was in the Lady Auxiliary club with the church, and it was a few other clubs; I just don't remember the other clubs.
Q. Did she like to dance?
A. Yeah, a lot.... We would go dancing a lot. [Before the surgery] when we (Mrs. Lewis and her husband) would come over, we'd have we'd go places, go out dancing, goes to party, go shopping, and everything. We'd just had a good time.
Q. She was a totally different person. I mean, she couldn't go shopping, couldn't go out, couldn't go dancing, or nothing. I mean, she just couldn't leave the house. She was just always in the house, she was depressed a lot of the times. I mean she wasn't the same person.
Finally, Mrs. Fusilier also testified about her restricted activities:
Q. What type of social activities are you now able to engage in since the problems you had in the surgery and the events that occurred in November, 1990?
A. I have no activity. I don't go to none of `em anymore since my surgery, becauseI'm gonna tell you why. The only thing I does is go to the doctor. And when I go to the doctor, I have to get up at 5:00 o'clock in the morning, take two Imodium AD Questrana dose of Questran. Just before I leave, I have to take two more and the Questran. Otherwise, I cannot leave the house. This surgery took everything that I had from me.
Q. Since the surgery, would it be fair to say that your life has been drastically affected?

*959 A. Yes. I'm going to tell you the way I feel. My life was taken away from me since the surgery.
Q. With regard to the activities that you used to do in your life prior to going into the hospital for the gallbladder surgery, can you tell the jury what type of things you used to like to do on a regular basis for a social nature, for fun?
A. Well, for fun, I liked to work, activity. I'd worked for charity. I was ... belonged to the Lady Auxiliary. I were there for anything they gave, the fair at St. Edward. I did it all. Go out dancing, party. I loved it more than I did eating.
Q. Did you, prior to November of 1990, regularly see your family, your sisters, your children, and relatives for social gatherings, parties, social occasions?
A. Yes, I did.
Q. [Before the surgery] were you working?
A. Yes, I was.... I worked two days before I went into the hospital.
Q. All right. And what type of work did you do?
A. Housework.
Mrs. Fusilier also testified she suffers from nightmares brought about by the pain she still has a result of the cholecystectomy:
Q. Do you suffer from any nightmares or problems as a result of what happened?
A. Yes, I did. I even had them since I was in the hospital. I was afraid; my sister had went to home, and when the nurse found me I was crossway the bed I was trying to get out the bed so I could go home, but I couldn't.
Q. Do you still bothered by any type of nightmares?
A. Yes, I do.
The court is of the opinion that Mrs. Fusilier is entitled to damages in the amount of $500,000.00 for pain, suffering and loss of enjoyment of life.

2. Past medical expenses in the amount of $67,876.75 plus legal interest.
Mrs. Fusilier requests in her brief an award of $67,876.75 in past medical expenses. Defendant alleges that Mrs. Fusilier is not entitled to recover as damages the amount of $43,037.26 which he asserts was written off by Iberia General Hospital. Defendant contends that as long as these expenses were not expenses incurred by Mrs. Fusilier, she is not entitled to their recovery by application of the collateral source rule.
In the instant case, there is no evidence on the record, testimonial or otherwise, that supports Defendant's assertion that the amount of $43,037.26 was written off by Iberia General Hospital and Medical Center from Mrs. Fusilier's bill. The only reference we have found addressing this written off is an assertion that Counsel for the Defendant made during his cross-examination of Mrs. Fusilier:
Mr. Judice: I asked her if the company if the bill was forgiven, because that's not a collateral source. Collateral source is when you pay for something for which there is no benefit for someone else ... not the forgiveness of the bill. He is putting on as though she paid she paid the bill, and she did not. The hospital wrote it off ....
Q. I just want to understand. That bill was not paid by you; is that correct?
A. No.
Counsel was not a witness, did not testify, and his assertion that "the hospital wrote it off" is not evidence. On the other hand, Plaintiffs have presented the medical bills that show that Mrs. Fusilier actually incurred those expenses, and Plaintiffs have therefore, carried their burden of proof. In light of the foregoing discussion, we find that Mrs. Fusilier is entitled to an award in the amount of $67,876.75 for past medical expenses plus legal interest since the day of the judicial demand.

*960 3. Future Medical Care.

In their brief, Plaintiffs request an award for future medical expenses. Defendant alleges that Plaintiffs did not introduce direct evidence into the record to justify such an award.
In Veazey v. State Farm Mutual Auto Ins., 587 So.2d 5, 8 (La.App. 3 Cir.1991), this court discussed future medical expenses:
Future medical expenses, like any other damages, must be established with some degree of certainty. The plaintiff must show that, more probably than not, these expenses will be incurred. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. An award for future medical expenses cannot be based on mere speculation of the jury. Much stronger proof, such as medical testimony of the specific expenses to arise, should be required for such an award.
[Citations omitted].
In the instant case, we find that the evidence is sufficient to award future medical expenses. Plaintiffs showed through the testimony of Dr. Stokes that Mrs. Fusilier was in need of additional medical care. Dr. Stokes testified that he recommended sending Mrs. Fusilier to a tertiary center in Dallas, Texas, where there is a group of physicians who specialize in treatment and conduct research of diarrhea exclusively. There is no doubt that Mrs. Fusilier will have to seek future medical care. Nevertheless, Plaintiffs failed to introduce evidence as to the probable cost of this care. The cost of these expenses was in no way established to any degree of certainty on the record. The Louisiana Supreme Court addressed this issue in Stiles v. K Mart Corp., 597 So.2d 1012, 1013 (La.1992):
When the record establishes that future medical expenses will be necessary and inevitable, the court should not reject an award of future medical expenses on the basis that the record does not provide the exact value of the necessary expenses, if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required. La.Code of Civ. Proc. art. 2164.
This court, being reluctant to reject the granting of an award for necessary future medical care on the basis that the record does not provide the cost of it, and following Stiles, looked for evidence on the record of similar past medical expenses as a reference to determine what would be a reasonable award in the instant case. Thus, having found evidence in the record of past medical care in the amount of $67,876.75, this court has the benefit of past medical care cost evidenced to give "a minimum amount that reasonable minds could not disagree will be required." Id. Therefore, given the past medical costs and the undisputed need for future medical treatment at a specialty clinic, this court grants the award of $50,000.00 in future medical expenses.

4. Loss of Consortium.
In the original petition, Plaintiffs asked for an award of loss of consortium suffered by both Mrs. Fusilier's husband and grandson. We will discuss Mrs. Fusilier's husband's and grandson's awards separately.

4.1. Mrs. Fusilier's husband's loss of consortium.

For the following reasons, this court finds that the plaintiff abandoned the issue of her husband's loss of consortium.
While Plaintiffs in their original petition sought an award for the loss of consortium suffered by Mrs. Fusilier's husband, Plaintiffs failed to request jury instructions on this issue. Moreover, the issue of loss of consortium was not itemized as an element of recovery on the jury form.
Plaintiffs failed to seek these damages on appeal. The Plaintiffs neither specified *961 this issue nor addressed it as an assignment of error in their appellate brief. "All specifications or assignments of error must be briefed. The court may consider as abandoned any specification or assignment of error which has not been briefed." Uniform Rules, Court of Appeal, Rule 2-12.4.
Plaintiffs also failed to seek an award for loss of consortium by argument in their brief filed to this court for assessment of damages after this case was remanded from the supreme court.
This court notes further that the Defendant is correct in its assertion that there is little evidence on the record to support a claim for loss of consortium on behalf of Mrs. Fusilier's husband. Plaintiffs failed to present any evidence, testimonial or otherwise, of Mrs. Fusilier's husband's loss of consortium during Mrs. Fusilier's pain history. This court cannot speculate as to an award for such damages. "As with any other item of damages, a person has the burden of proving loss of consortium by a preponderance of the evidence." Pitts v. Bailes, 551 So.2d 1363,1380 (La.App. 3 Cir.), writ denied, 553 So.2d 860 (La.1989), writ denied, 556 So.2d 1262 (La.1990).

4.2. Mrs. Fusilier's grandson's loss of consortium.

Defendant further pointed out that Mrs. Fusilier's grandson is not entitled to bring a claim for loss of consortium.
To have a right of action for loss of consortium, the Plaintiff must fit into one of the "categories of persons who would have had a cause of action for wrongful death of an injured person." La.Civ .Code art. 2315. La.Civ.Code. art. 2315.2 does not provide that grandchildren of the deceased may file a wrongful death action.
For these reasons loss of consortium damages are not awarded.

CONCLUSION.
We hold that Mrs. Fusilier is entitled to an award of $500,000.00 in general damages with legal interest thereon from the date of judicial demand until paid. This amount shall be paid as follows: by Defendant, Dr. Dauterive, the amount of $100,000.00, plus interest accruing thereon from the date of the judicial demand until paid, and by the Louisiana Patient's Compensation Fund the amount of $400,000.00, plus interest accruing from the date of the judicial demand. We hold that Mrs. Fusilier is entitled to an award in the amount of $67,876.75 for past medical expenses, and award in the amount of $50,000.00 with legal interest thereon from the date of judicial demand until paid. All costs are assessed to the Defendant.
RENDERED.