900 So.2d 991 (2005)
Brenda Walker Wife of/and Ronald WALKER
v.
Ralph L. CORSETTI, M.D.
No. 04-CA-784.
Court of Appeal of Louisiana, Fifth Circuit.
March 29, 2005.
*992 Pierre F. Gremillion, Metairie, Louisiana, and Jack A. Grant, Gretna, Louisiana, for Plaintiffs/Appellants.
Peter E. Sperling, Carl E. Hellmers, III, New Orleans, Louisiana, for Defendant/Appellee.
Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA, and SUSAN M. CHEHARDY.
SOL GOTHARD, Judge.
In this medical malpractice case plaintiffs, Brenda Walker, wife of/and Ronald Walker, appeal an October 22, 2003 final judgment in favor of defendant, Ralph L. Corsetti, M.D. and a January 14, 2004 judgment denying plaintiffs' "Motion for Judgment Notwithstanding the Verdict, or, in the Alternative, Motion for New Trial." For reasons that follow, we reverse.
Brenda Walker went to see her treating physician complaining of abdominal pains. An ultrasound was performed and it was determined that Mrs. Walker had gallstones. She was referred to Dr. Corsetti, who diagnosed her with acute and chronic cholecystitis (inflammation of the gallbladder) and recommended that she have her gallbladder removed. Mrs. Walker was scheduled to have her gallbladder removed via a surgical procedure called a laparoscopic cholecystectomy.
*993 Surgery was performed on November 17, 1998. Mrs. Walker was discharged from the hospital but later returned with complaints of severe abdominal pain. She was readmitted and diagnostic tests revealed clips on the common bile duct, which had been placed there during her gallbladder surgery. At trial Dr. Corsetti admitted that he did clip and divide the common bile duct and the common hepatic duct. Subsequently, Dr. Corsetti, with the assistance of another general surgeon, performed a surgical procedure to repair the bile duct injury.
A medical review panel was convened in this matter and unanimously found that the evidence did not support the conclusion that the defendant failed to meet the applicable standard of care as charged in the complaint. Their reasons for so finding were: 1) ductal damage during a laparoscopic cholecystectomy is a known complication of the surgery and the complication was promptly recognized and treated appropriately; 2) the repair procedure performed by Dr. Corsetti was within the standard of care of general surgeons; and, 3) Dr. Corsetti was assisted by an experienced general surgeon, who was also qualified to repair bile duct injuries.
Plaintiffs subsequently filed a petition for damages against Dr. Corsetti alleging that he failed "to use the care and skill ordinarily employed by physicians within his specialty in that had defendant used the same care, skill, and diligence as other physicians with the same specialty, then defendant would have properly treated Brenda Walker without causing her injuries." Plaintiffs also asserted their claims of negligence, unskillfulness, and improper medical care and treatment by defendant under the doctrine of res ipsa loquitur.
The matter proceeded to trial and the jury returned a verdict in favor of defendant finding that he did not breach the standard of care for general surgeons in his treatment of Brenda Walker. On its own motion, the court made the verdict of the jury the judgment of the court. The court denied plaintiffs' "Motion for Judgment Notwithstanding the Verdict, or, in the Alternative, Motion for New Trial." Plaintiffs appealed.
In brief to this Court plaintiffs argue that the jury's finding that defendant met the standard of care for general surgeons is contrary to evidence and law. Plaintiffs contend that the jury made its findings of fact based on defendant's efforts to correct his negligent injuries to Mrs. Walker's common hepatic duct, common bile duct, and hepatic artery. Therefore, plaintiffs reason that the jury's focus on the curative measures and genuine remorse displayed by defendant on the witness stand distracted them from their duty to assign negligence.
La. R.S. 9:2794 provides, in pertinent part:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq ...., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to *994 use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
* * *
C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician.... The jury shall be further instructed that injury alone does not raise a presumption of the physician's... negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable.
The Supreme Court of Louisiana discussed medical malpractice jurisprudence in Fusilier v. Dauterive, 00-151 (La.7/14/00), 764 So.2d 74, 79:
A physician is required to exercise that degree of skill ordinarily employed under similar circumstances by others in the profession and also to use reasonable care, diligence, and judgment. A physician is not required to exercise the highest degree of care possible; rather, his duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. In a medical malpractice action, the plaintiff has the burden of proving, by a preponderance of the evidence, (1) that the doctor's treatment fell below the standard of care expected of a physician in his medical specialty; and (2) the existence of a causal relationship between the alleged negligent treatment and the injury sustained. (citations omitted)
Because there are no issues regarding causation, the only issue presented for our review is whether Dr. Corsetti breached the standard of care owed to plaintiff, Brenda Walker, in this matter. Resolution of this inquiry is a determination of fact and therefore should not be reversed on appeal absent manifest error. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991).
At trial plaintiffs presented the testimony of Dr. James Maher, an expert in the medical specialty of general surgery. Dr. Maher testified that during a laparoscopic cholecystectomy the surgeon cuts the cystic duct and the cystic artery, detaches the gallbladder from the liver, and removes it. In Dr. Maher's opinion the national standards of care require the conclusive and positive identification of the cystic duct and the cystic artery to safely perform a laparoscopic cholecystectomy. A surgeon must dissect all of the tissue out of the area until he sees where the cystic duct and cystic artery run into the gallbladder. In Dr. Maher's opinion, Dr. Corsetti's dissection of the area was below the national standard of care, and because Dr. Corsetti failed to properly clear the area out, he mistakenly cut the common bile duct and the common hepatic duct and severely injured Mrs. Walker. Dr. Maher also stated that Dr. Corsetti violated the most basic surgical principal, that being to know what he was cutting, and that he breached the standard of care. And in Dr. Maher's opinion, any time you have a common bile duct injury from a laparoscopic cholecystectomy it is necessarily, in all cases, negligence.
Dr. Maher testified that general surgeons are trained to look for anatomical variations and he found nothing in Mrs. Walker's medical records to indicate that she had any such variations.
Dr. Maher also testified that a laparoscopic cholecystectomy can become quite *995 dangerous if a surgeon's view is obscured due to too much inflammation or bleeding. In such a situation, a surgeon would consider converting to an open gallbladder removal procedure. In Dr. Maher's opinion Mrs. Walker had at least ten times the average blood loss in a laparoscopic cholecystectomy. Dr. Maher further stated that a diagnostic procedure called a cholangiogram is available to surgeons if they are confused about the anatomy. During a cholangiogram, dye is injected into the bile duct via a tube inserted through a small incision in the duct and x-rays are taken.
Dr. Maher also testified regarding Mrs. Walker's repair procedure. He stated that it is difficult to restore the flow of bile from the liver to the intestine and that the repair surgery is quite complex. You must reestablish the flow because bile is important in food digestion and because if bile backs up in the liver it will eventually produce cirrhosis of the liver, liver failure, and in the most severe cases, the need for a liver transplant.
Dr. Maher stated that the repair procedure performed by Dr. Corsetti had a high likelihood of failure and was below the national standard of care. Dr. Corsetti reconstructed a bile duct which, because of its small size, scarred down, thereby stopping the flow of bile to the intestine. Dr. Maher testified about an alternative technique that would have greatly improved the success rate of the reconstruction. According to Dr. Maher, a concensus of medical opinion believes that this other technique is the best way to reconstruct the bile duct. When Mrs. Walker eventually had to have the repair revised, they used the technique that Dr. Maher recommended.
Two members of the medical review panel in this matter, Dr. Julius Levy and Dr. Kelvin Contreary, testified as experts in the medical specialty of general surgery. Dr. Levy testified that Dr. Corsetti's dissection and repair procedures met the standard of care. However, he also testified that standards require that a general surgeon use meticulous care in identifying all of the ductal structures while performing a laparoscopic cholecystectomy. Dr. Contreary agreed with the medical review panel's opinion that the evidence did not support the conclusion that Dr. Corsetti failed to meet the applicable standard of care.
The defendant, Dr. Ralph Corsetti, also testified at trial. He admitted that he improperly placed clips on the common bile duct and the common hepatic duct and divided those structures, causing Mrs. Walker's injury, but denied any negligence or malpractice. He said that he has never tried to deny responsibility for what occurred and that he feels remorse for Mrs. Walker's injury.
Dr. Corsetti testified that during laparoscopic cholecystectomy procedure a surgeon is trying to identify and isolate the cystic duct, which connects the gallbladder to the common bile duct, apply clips to the cystic duct to prevent bile leakage, and remove the gallbladder. Incisions are made in a patient's body, through which instruments and a camera are inserted. Dissection (removal of tissue) is used to clear the area and thereby identify the cystic duct and potentially the cystic artery.
Dr. Corsetti testified as to what he believes, in retrospect, happened during Mrs. Walker's surgery. According to Dr. Corsetti, the cystic duct can sometimes run parallel to the common hepatic duct and have a common channel for quite a long time. Dr. Corsetti believes that acute inflammation caused Mrs. Walker's gallbladder to be tethered against the common hepatic duct and he mistook the whole *996 area for the gallbladder. After dissection he mistook the common bile duct for the cystic duct and put clips on the wrong duct. Because both ends of the duct were clamped, there was no bile or blood leakage, and, according to Dr. Corsetti, no indication that something was wrong. He then mistook the common hepatic duct for the cystic artery and clipped it. What he thought were the superficial and deep branches of the cystic artery were actually the common hepatic duct and the cystic artery. Again, the clips prevented any leakage and any sign of a problem. However, bleeding did occur afterwards, but it did not obscure his vision and he was able to control it with clips. At the time, he mistakenly believed that the bleeding was caused by another branch of the cystic artery. He further testified that he did not do an intra-operative cholangiogram because he felt he was in the proper anatomic location.
Dr. Corsetti also testified that the repair surgery he performed on Mrs. Walker was designed to be the safest procedure to avoid the risk of strictures. Dr. Frank Divincenti, who assisted Dr. Corsetti with the repair surgery and testified as an expert in general surgery, agreed with him.
In brief to this court plaintiffs cite Fusilier v. Dauterive, supra in support of their appeal. In Fusilier, the Supreme Court of Louisiana held that the jury was manifestly erroneous in concluding that Dr. Dauterive was not negligent and reversed the judgment of the trial court. The court repudiated the contention that the standard of care is met when a physician, who negligently causes injuries, takes measures to correct them. Defendant argues that the only similarity between Fusilier and the present case is that they both involve laparoscopic cholecystectomy. We disagree.
There are a number of similarities between Fusilier and the present case. Both Mrs. Fusilier and Mrs. Walker were seriously injured during the procedure and both had emergency corrective surgery; both filed unsuccessful claims with the Medical Review Panel. In Fusilier the panel concluded that Dr. Dauterive, "demonstrated appropriate skill as a general surgeon; the complication experienced by plaintiff is a known complication which, once discovered, was treated appropriately." Fusilier, supra at 77. In the present case the panel similarly found that Mrs. Walker's injury is a known complication of the surgery which was promptly recognized and treated appropriately. Both claims were tried by a jury, and in both cases the jury found in favor of the defendant. As in the present case, plaintiffs' expert in general surgery opined that the defendant had breached the standard of care; and his testimony was controverted by other witnesses, including a doctor who assisted the defendant during the procedure and a member of the medical review panel in the case.
Defendant contends in brief that this is simply a case of a recognized complication. We disagree. Defendant's own testimony indicates that he made a series of misidentifications during the laparoscopic cholecystectomy procedure. In trying to explain what happened during Mrs. Walker's surgery, defendant stated that sometimes the cystic duct can run parallel to the common hepatic duct and have a common channel for quite a long time. He believed that acute inflammation caused Mrs. Walker's gallbladder to be tethered against the common hepatic duct. However, Dr. Maher testified that there was no evidence that Mrs. Walker had any anatomical abnormalities, and in any event, surgeons are trained to look for such anomalies. Further, Dr. Levy testified that standards require that a general surgeon use meticulous *997 care in identifying all of the ductal structures while performing a laparoscopic cholecystectomy. Dr. Maher noted that if a surgeon's view is obscured due to too much inflammation or bleeding, a laparoscopic cholecystectomy can become quite dangerous. In his opinion Mrs. Walker had at least ten times the average blood loss in a laparoscopic cholecystectomy. Dr. Maher also stated that a surgeon can perform a cholangiogram to help identify structures if they are confused about the anatomy and there is also the option of converting the procedure to an open procedure.
After reviewing all of the evidence and the testimony, we hold that the jury was manifestly erroneous in finding that Dr. Cortessi did not breach the standard of care for general surgeons in his treatment of Brenda Walker. Therefore, we will now review the record for the purpose of awarding damages.
Mrs. Walker testified that when she woke up following her gallbladder removal surgery, she was experiencing severe pain in the upper right quadrant of her abdomen, was having trouble breathing, and could not hold any food down. These symptoms persisted through the night. When Dr. Corsetti visited her hospital room in the morning she told him that she was in extreme pain and that something was wrong. He told her that it would get better in time and left. She made the same complaints to him the next day, but he discharged her from the hospital a couple of hours later. She was still on oxygen at the time, so they wheeled her to the car with a portable oxygen tank, removed it and sent her home.
Once home, her husband had to assist her into bed. The pain was so intense that she struggled to breathe. She kept asking her husband for more pain medicine, but there was nothing he could do because the prescription required that she wait four hours between doses. Her husband tried several times to get her to eat something, but she refused because of the persistent nausea. She described that first night home as miserable and sleepless. Her husband stayed by her side, dozing off and then waking every time his wife moaned in pain. She went, with her husband's assistance, back and forth to the restroom throughout the night.
Early the next morning plaintiffs paged Dr. Corsetti twice. When he returned their page, Mrs. Walker told him that something was terribly wrong. He instructed her to go to the emergency room. At the hospital she was in and out of consciousness and remembers little except that she had several tests done. Following the tests she had surgery to repair an injury to her bile duct.
After the repair surgery on November 20th, she woke up on a respirator in intensive care. This frightened her because she is claustrophobic and has a fear of drowning. Doctors told her that she was put on a respirator because the bile that was leaking from her system had gotten into her lungs and caused her to have breathing problems. She remained in intensive care for approximately ten days and in the hospital until December 7th. The record indicates that this second hospitalization was extended because of post-operative sepsis (infection) and respiratory insufficiency which required reintubation and ventilation.
Following her discharge from the hospital, she remained on oxygen twenty-four hours a day for thirty days. The pain had greatly decreased but she could not leave the house or do anything. In January she had a follow-up appointment with Dr. Corsetti to remove a drain from her stomach. That same month a stricture was discovered *998 which required a balloon dilation to open it up. In May she had a hernia repair. In September she developed a major biliary stricture and had to have several procedures done. The following February they had to redo the entire repair procedure because of a stricture.
Mrs. Walker testified that after the initial surgery she had only a few small one inch incisions. The repair surgery left her with a sixteen inch scar on her abdomen. Her stomach now appears "lumpy" because after the first and second surgeries bile leaked onto her organs. Because bile is like acid it "welded" all of her organs together. So instead of them flowing freely within her body, "they're all one big lump now."
Mrs. Walker further testified that she is in pain every day and hurts from the time she opens her eyes to the time she closes them. She can no longer sleep in her bed at night because it is too uncomfortable. Instead, she has to sleep in a sitting position on the couch with pillows propped around her to keep her from moving or else she wakes up every ten or fifteen minutes in pain. When she does wake up in pain she has to "walk it off a little bit" before going back to sleep.
Both Mr. and Mrs. Walker testified that before her injury they enjoyed a happy and very active life. They did everything together. They bowled, went dancing, participated in fund raisers, entertained a lot at home, and were entertained by friends at their homes. That all changed after her injury. Mr. Walker testified that they have tried to be like they were before the injury, but that it is just not possible because his wife is in pain all of the time. He stated that they hardly enjoy anything anymore. Additionally, Mrs. Walker is no longer able to clean the house and is confined to the couch at home. Now reading is her primary pastime.
Mr. Walker stated that he thought his wife was going to die when he learned that a mistake had been made during her gallbladder surgery and saw her in intensive care and on a respirator. He also testified that their marital relationship has changed because of the injury. His wife's pain prevents them from having marital relations and they no longer sleep in the same bed.
Dr. Frederick Reganstein testified as an expert in internal medicine with gastroenterology, along with experience and expertise involving liver disease. Dr. Reganstein was Mrs. Walker's treating physician. She was referred to Dr. Reganstein after her laparoscopic cholecystectomy and bile duct reconstruction. She was having recurrent bouts of pain in the upper right quadrant of her abdomen and elevated liver chemistries. He determined that Mrs. Walker had a very high grade blockage in the bile duct system and used various techniques to open up the obstruction.
Dr. Reganstein last saw Mrs. Walker approximately two years ago. He subsequently learned that she did not return to his office because she lost her health insurance. He testified that the normal course of treatment for patients like Mrs. Walker would be to monitor them by running tests once or twice a year and consider additional testing in the event of abnormal results. His prognosis for Mrs. Walker was routine follow-ups for liver chemistries.
Dr. Reganstein also testified that the care that he provided to Mrs. Walker was directly related to a bile duct injury.
The record shows that Mrs. Walker was born on September 20, 1959. Her laparoscopic cholecystectomy procedure was performed on November 17, 1998. Therefore, she was only thirty-nine years old at the time of the injury. At trial, which was held nearly five years after the *999 surgery, Mrs. Walker reported still being in pain from the time she opened her eyes to the time she closed them. The evidence and testimony indicate that she will be in pain for the rest of her life. Additionally, Mr. Walker testified that he and his wife neither have marital relations nor even sleep in the same bed because of her pain. Their once very active and social lifestyle ended with the injury. Now Mrs. Walker is consigned to her couch, even at night. Also, because of the injury, Mrs. Walker is left with almost a foot and a half long scar on her abdomen and internal organs that are "welded" together, giving her body a scarred and "lumpy" appearance. Mrs. Walker has had to endure a grueling number of tests, procedures, and hospital admissions because of her injury. Her problems have included cholangitis, bile duct strictures, abdominal pains, incisional hernia, and wound neuroma. As a result, she has incurred nearly $300,000.00 in medical bills, and the evidence and testimony indicate that she will continue to incur related medical expenses for the rest of her life. At the very least she will need to visit a doctor once or twice a year to monitor her liver chemistries. And if her results are abnormal, she will need a minimum of additional testing. Mrs. Walker testified that her worst case prognosis is that she will need a liver transplant.
Accordingly, we award plaintiffs $500,000.00 in general damages. See Fusilier v. Dauterive, 99-00692 (La.App. 3 Cir. 1/10/01), 779 So.2d 950.
We also award $297,704.83 for past medical expenses and $50,000.00 in future medical expenses.
Therefore, we reverse the judgment of the trial court and award plaintiffs $500,000.00 in general damages, $297,704.83 in special damages, and $50,000.00 in future medical expenses. Costs for this appeal are to be paid by defendant.
REVERSED.