852 So.2d 513 (2003)
In re Vicki ABDO, Applying for a Medical Review Panel.
Vicki Sprague Abdo, Individually, on Behalf of, and in Her Capacity as Curatrix of Her Husband, Leonard Abdo, and on Behalf of and in Her Capacity as Natural Tutrix of Her Minor Children, Velena Abdo, Vernoica Abdo, and velicity Abdo
v.
John F. Schuhmacher, M.D., Doctors Hospital of Jefferson, Thomas S. Whitecloud, III, M.D., Tulane University Medical Center, James Ricciardi, M.D., and George Chimento, M.D.
Nos. 2002-CA-2513, 2002-CA-2514.
Court of Appeal of Louisiana, Fourth Circuit.
July 9, 2003.
*515 James C. Klick, Joseph A. Kott, Herman, Herman, Katz & Cotlar, New Orleans, LA, and Thomas M. Discon, Discon Law Firm, Mandeville, LA, for Plaintiff/Appellant.
Stewart E. Niles, Jr., Michelle A. Bourque, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, for Defendant/Appellee.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY III, Judge LEON A. CANNIZZARO, JR.).
JAMES F. McKAY, III, Judge.
The plaintiffs, Vicki Sprague Abdo, individually and on behalf of and in her capacity as curatrix of her husband, Leonard Abdo, and on behalf of and in her capacity as natural tutrix of her minor children, Velena Abdo, Veronica Abdo and Velecity Abdo, appeal a trial court judgment in favor of the defendant, The Administrators of the Tulane Educational Fund d/b/a Tulane University Medical Center (TUMC), in this medical malpractice action. We affirm.

FACTS AND PROCEDURAL HISTORY
On March 4, 1993, Dr. John Schumacher performed a C5-6/C6-7 anterior cervical discectomy and fusion on Leonard Abdo at Doctor's Hospital of Jefferson (DHJ). Mr. Abdo was hospitalized at DHJ from March 4 through March 13, 1993, when he left DHJ against medical advice because he was unhappy with his treatment and was admitted to TUMC.
Upon his admission to TUMC, Mr. Abdo's right ilium bone graft donor site was infected. Therefore, on March 14, 1993, Dr. James Ricciardi, an orthopedic surgeon, assisted by Dr. George Chimento, an orthopedic resident, performed an irrigation and debridement of Mr. Abdo's right iliac crest donor site and on March 16, 1993 Dr. Ricciardi closed the site. On March 17, 1993, an MRI of the cervical spine revealed a probable cervical abscess. The next day, Dr. Thomas Whitecloud, an orthopedic surgeon, assisted by Dr. Ricciardi, performed an irrigation and debridement of Mr. Abdo's anterior cervical fusion site with drainage of the abscess, revision of the strut graft at C5-C7, and application of a halo traction. Mr. Abdo *516 was then transferred to the critical care unit where his cardiopulmonary status was continuously monitored.
Between March 18 and March 21, 1993, Mr. Abdo's vital signs remained stable, his neurovascular status remained intact, and his pulse oximetry oxygen saturation levels were normal. He was also intermittently confused, restless, and agitated with related elevation of his blood pressure and heart rate.
From approximately 7:00 a.m. until 7:00 p.m. on March 21, 1993, C. Daniel Daugherty, R.N. was the nurse assigned to Mr. Abdo. During this time, Mr. Abdo's vital signs were stable; his respirations were regular and unlabored on room air; he produced no sputum; his pulse oximetry oxygen saturation levels were normal; he also denied shortness of breath and took 700 cc's of fluids by mouth. Mr. Abdo was given morphine intravenously for pain and was given ativan intravenously for restlessness and agitation. Dr. Ricciardi examined Mr. Abdo at 7:40 a.m. and Dr. Chimento examined Mr. Abdo at 8:10 a.m. Both Dr. Ricciardi and Dr. Chimento were aware of Mr. Abdo's restlessness and agitation. Dr. Mark Bielke, an infectious diseases specialist, examined Mr. Abdo at 11:40 a.m. Mr. Daugherty documented that Mr. Abdo's breath sounds were abnormal at 8:30 a.m. with a "rumble" and then again at 2:30 p.m. with a slight inspiratory wheeze.
Between 6:30 p.m. and 6:45 p.m., Mary Kay Campbell, R.N. assumed care of Mr. Abdo. During her initial assessment of Mr. Abdo, he was restless and agitated and had a related elevated blood pressure of about 220/110. At 7:00 p.m., Ms. Campbell called Dr. Chimento and reported her assessment of Mr. Abdo. Dr. Chimento instructed Ms. Campbell to give Mr. Abdo 50 mg of Benadryl intramuscularly every six hours as needed and to give Haldol if Mr. Abdo did not calm down in a half hour. Dr. Chimento also instructed Ms. Campbell to reassess Mr. Abdo twenty to thirty minutes after giving the Haldol and to call him back if Mr. Abdo was still restless and his blood pressure remained high.
Between 7:10 p.m. and 7:30 p.m., Mr. Abdo remained anxious and agitated. Around 7:15 p.m., Ms. Campbell gave Mr. Abdo 50 mg of Benadryl intramuscularly. At 7:30 p.m., Ms. Campbell documented her initial assessment of Mr. Abdo, which stated: he was restless, confused, and combative; he had normal sinus cardiac rhythm and was in a sinus tachycardia; and his respirations were clear and unlabored on room air. At 7:30 p.m., Ms. Campbell rechecked Mr. Abdo's blood pressure and it was 280/137.
Between 7:30 p.m. and 7:45 p.m., Mr. Abdo's systolic blood pressure came down to the 220s over 110s but he remained restless and agitated. At 7:45 p.m., Ms. Campbell gave Mr. Abdo 5 mg of Haldol intramuscularly. At 7:56 p.m., Mr. Abdo's monitor alarms went off and Ms. Campbell found him unresponsive; he suffered respiratory arrest. Mr. Abdo was resuscitated but he remained unresponsive.
A cervical x-ray done at 9:45 p.m. on March 21, 1993 showed no evidence of prevertebral soft tissue swelling and a lung ventilation perfusion scan was negative for pulmonary embolism. A March 22, 1993 CT scan of the head confirmed that Mr. Abdo had not had a stroke. Urine toxicology screens on March 22, 24, and 30, 1993 revealed the presence of marijuana metabolites; there was also evidence that Mr. Abdo had smoked marijuana prior to his March 18, 1993 surgery.[1] *517 Mr. Abdo's treating physicians ultimately concluded, based on a diagnosis of exclusion, that his respiratory arrest was precipitated by an unforeseeable idiosyncratic reaction to his multiple medications, complicated by his marijuana use.
On May 5, 1993, Mr. Abdo was transferred to Touro Infirmary's Rehabilitation Unit, with a diagnosis of anoxic encephalopathy. He remained there in a chronic vegetative state until August 20, 1993, when he was discharged. On July 16, 1996, Mr. Abdo died at home.[2]
On May 24, 1995, the plaintiffs filed a medical malpractice suit alleging that Leonard Abdo's anoxic encephalopathy was proximately caused by negligent care provided by defendants, Dr. John Schumacher, DHJ, TUMC, Dr. Thomas Whitecloud, III, Dr. James Ricciardi and Dr. George Chimento.[3] In June of 1998 motions for summary judgment were filed on behalf of Dr. Whitecloud, Dr. Ricciardi, Dr. Chimento, TUMC and Dr. Schumacher. On August 24, 1998, the plaintiff voluntarily dismissed her claims against Dr. Schumacher and DHJ. On February 11, 2000, the trial court granted summary judgment in favor of Dr. Whitecloud, Dr. Ricciardi, and Dr. Chimento. The case against TUMC proceeded to trial on September 10 and 12, 2001 and March 11, 12, and 13, 2002. On September 13, 2002, the trial court entered judgment in favor of TUMC.

DISCUSSION
On appeal, the plaintiffs raise the following assignments of error: 1) the trial court impermissibly interfered with plaintiffs' cross examination of witnesses; 2) the trial court improperly refused to allow the plaintiffs to expand the pleadings to assert liability against TUMC based on Dr. Chimento's testimony that he would have continued to order Haldol and not consider an anti-hypertensive medication, even if Ms. Campbell would have reported to him an elevated blood pressure of 280/137 at 7:30 p.m.; 3) the errors of the trial court, whether taken individually or in combination, deprived the plaintiff of a fair trial, such that this Court should either order a new trial or review the record de novo to determine the issues pertaining to liability, causation and damages; and 4) regardless of whether this Court reviews the factual findings de novo or under the manifest error rule, factual determinations squarely establish that Ms. Campbell breached the standard of care with regard to her treatment of Mr. Abdo, and that this breach of the standard of care deprived Mr. Abdo of a reasonable chance of survival and caused plaintiffs in this case damages.
It is well settled that a court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Furthermore, where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989). The only issue on appeal is whether the factfinder's conclusion was reasonable, not whether it was right or *518 wrong. Evaluation of live witnesses on matters of credibility is better determined by the trial court, rather than from a cold record. Credibility and reasonable inferences of fact should not be disturbed where there is evidence of conflicting testimony at trial. Stobart v. State, 617 So.2d 880 (La.1993).
In the instant case, the trial court concluded that Ms. Campbell complied with the standard of care and that no breach by Ms. Campbell deprived Mr. Abdo of a chance of survival. The plaintiffs were required to prove with expert testimony the applicable standard of care, that Ms. Campbell breached the nursing standard of care, and a causal nexus between such a breach and Mr. Abdo's March 21, 1993 respiratory arrest. The plaintiffs were required to prove the alleged nursing malpractice by a preponderance of the evidence. Injury alone does not raise a presumption that a physician or nurse was negligent. See La. R.S. 9:2794(C). See also Barre v. Nadell, 94-1883 (La.App. 4 Cir. 6/7/95), 657 So.2d 514, 518. Hindsight or subsequent events cannot be considered when determining whether a nurse's actions were reasonable and met the standard of care. A nurse's "professional judgment and conduct are evaluated in terms of reasonableness under the then existing circumstances, not in terms of result or in light of subsequent events." Beckham v. St. Paul Fire and Marine Ins. Co., 614 So.2d 760, 764 (La. App. 2 Cir.1993).[4] In the instant case, the plaintiffs have failed to prove with expert testimony that Ms. Campbell has breached any standard of care.[5] Accordingly, we find nothing clearly wrong or manifestly erroneous with the trial court's judgment on this issue.
The plaintiffs contend that the trial court impermissibly denied them the opportunity to cross-examine the defendant's witnesses and improperly commented on the evidence. Essentially, what the plaintiffs are complaining about is that the trial court denied them the opportunity to cross-examine the defendant's witnesses for a second time.
A trial judge has discretion in the manner in which proceedings are conducted before his court, and it is only upon a showing of gross abuse of discretion that appellate courts intervene. Briscoe v. Briscoe, 25,955 (La.App. 2 Cir. 8/17/94), 641 So.2d 999, 1005. Louisiana Code of Civil Procedure article 1631 gives the trial judge the power to conduct trial in an orderly and expeditious manner. Furthermore, a judge has the discretion to participate in the questioning of witnesses. See La.Code Evid. art. 614.
In the instant case, based on the record before us, it appears that the trial court conducted the trial in an orderly and expeditious manner. We must note that as this was a bench trial, the judge's comments can in no way be viewed as prejudicial. *519 Accordingly, we find no abuse of the trial court's discretion regarding this issue.
The plaintiffs contend that the trial court improperly refused to allow them to expand the pleadings to assert liability against TUMC based on Dr. Chimento's testimony that he would have continued to order Haldol and not consider an anti-hypertensive medication, even if Ms. Campbell would have reported to him an elevated blood pressure of 280/137 at 7:30 p.m.
The plaintiffs' claim against Dr. Chimento was dismissed more than a year before trial on a motion for summary judgment. Louisiana Code of Civil Procedure 968 provides that summary judgments are final judgments and "shall be rendered and signed in the same manner and with the same effect as if trial had been had upon evidence regularly adduced."[6] Accordingly, any issue of Dr. Chimento's alleged negligence was not before the court at the time of trial. Therefore, we find no error in the trial court's refusing to allow the plaintiffs to expand their pleadings.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal shall be borne by the plaintiffs.
AFFIRMED.
MURRAY, J., Concurs in the Result.
NOTES
[1] A March 17, 1993 physical therapy note indicates that Mr. Abdo was "smoking in room." Dr. Chimento testified that this note related to when Mr. Abdo was smoking marijuana in his room the day before his March 18, 1993 surgery.
[2] He remained in a chronic vegetative state until he died.
[3] A medical review panel rendered an opinion finding that the evidence did not support the conclusion that any of the defendants failed to meet the applicable standard of care as charged in the complaint.
[4] In Beckham, this standard of care refers specifically to a physician. By analogy this standard of care can be applied to a nurse.
[5] Crystal Keller, the plaintiffs' nursing expert, opined that Mr. Daugherty's and Ms. Campbell's care of Mr. Abdo was "substandard" because they allegedly did not employ "critical thinking" and failed to recognize and report "anticipatory signs" of respiratory distress. Dr. Edwin Ross, the plaintiffs' causation expert, testified regarding general observations but conceded that he was not engaged to say what caused Mr. Abdo's respiratory arrest and was not qualified to opine regarding the cause of Mr. Abdo's respiratory arrest.
[6] It makes no difference whether this judgment was with or without prejudice.