853 So.2d 726 (2003)
Francis HINSON, et al., Plaintiffs-Appellees,
v.
THE GLEN OAK RETIREMENT SYSTEM, d/b/a The Glen Oak Retirement Home, Defendants-Appellants.
No. 37,550-CA.
Court of Appeal of Louisiana, Second Circuit.
August 20, 2003.
Rehearing Denied September 18, 2003.
*727 Wiener, Weiss & Madison, by John M. Madison, Jr., Shreveport, for Appellant.
Georgia Kosmitis, Shreveport, for Appellee.
Before BROWN, CARAWAY, and TRAYLOR (Pro Tempore), JJ.
BROWN, C.J.
On December 11, 1996, Francis Hinson and Beverly Martin, individually and on behalf of their elderly mother, Lucille Reagan, filed suit against defendant, the Glen Oak Retirement System, d/b/a the Glen Oak Retirement Home ("the Glen"), a nursing home, alleging personal injury, breach of contract and violations of La. R.S. 40:2010.8, the Nursing Home Residents' Bill of Rights ("NHRBR").[1] Plaintiffs alleged, inter alia, that the nursing staff failed to accurately document and monitor Mrs. Reagan's bowel habits and constipation and that this failure resulted in a delayed diagnosis of her colon cancer.
Trial on the merits was held from February 28 to March 5, 2002. On August 29, 2002, the trial court rejected plaintiffs' breach of contract and personal injury claims but, based upon violations of the NHRBR, awarded wrongful death and survival damages as follows: (1) $20,000 to Mrs. Hinson and $20,000 to Mrs. Martin for decreased/loss of chance of survival related to the delay in diagnosis of Mrs. Reagan's colon cancer; (2) $25,000 to plaintiffs for Mrs. Reagan's pre-death suffering; and (3) $25,000 in attorney fees, together with costs pursuant to La. R.S. 40:2010.9. Defendant appealed, raising procedural, evidentiary and substantive issues. *728 Finding that plaintiffs failed to introduce evidence to carry their burden of proof, however, we reverse.[2]

Brief Factual Background
Mrs. Reagan was admitted to the Glen on June 1, 1992. At that time, she was 79 years old and her admitting diagnosis was Alzheimer's disease, depression, cerebral atherosclerosis, senile dementia with delirium and chronic mental syndrome.
On July 3, 1996, Mrs. Reagan was admitted to Schumpert Medical Center with complaints of abdominal pain. A colonoscopy was performed which revealed Stage II cancer, including a "large, hard cancer that was nearly obstructing the cecal area." She was anemic from blood loss and required a blood transfusion. On July 6, 1996, Mrs. Reagan underwent colon resection surgery. After going between the Glen and Schumpert for approximately a month and a half, Mrs. Reagan moved in with her daughter, Francis Hinson, where she lived until her death on October 6, 1997.

Discussion
The NHRBR requires that all nursing homes adopt and make public a statement of the rights and responsibilities of its residents and treat such residents in accordance with an enumerated list of 22 rights. La. R.S. 40:2010.8. In this case, although concluding that plaintiffs failed to establish their contract and personal injury claims, the trial court found that defendant violated paragraph (A)(6), which is the right to be adequately informed of her medical condition and proposed treatment, and participate in the planning of such treatment, including the right to refuse treatment, unless otherwise indicated by the resident's physician, and paragraph (A)(7), which is the right to receive adequate and appropriate health care and protective and support services, including services consistent with the resident care plan, with established and recognized practice standards within the community, and with rules promulgated by the Department of Health and Hospitals. Based upon these violations, the trial court awarded wrongful death and survival damages to plaintiffs, after making the following factual findings:
(1) The Glen failed to properly chart Mrs. Reagan, particularly her bowel habits and constipation, beginning in June 1995.
(2) This failure resulted in a further failure to effectively monitor Mrs. Reagan's records and properly coordinate her care plan.
(3) There was a lack of effective communication with Mrs. Reagan's doctor, Dr. Alan Borne.
(4) The failure to properly chart Mrs. Reagan resulted in a substantial delay in diagnosis of her colon cancer.
(5) Mrs. Reagan lost a less than equal chance of survival by virtue of the delayed diagnosis of her condition.
As noted by the supreme court in Richard v. Louisiana Extended Care Centers, Inc., 02-0978 (La.01/14/03), 835 So.2d 460, the legislature's enactment of the NHRBR was not intended to remove malpractice *729 claims against qualified health care providers from the coverage of the Louisiana Medical Malpractice Act (MMA), but was instead intended to provide nursing home residents with important rights to preserve their dignity and personal integrity and to provide a means by which they could enforce these rights.
Although there are many claims that a person can assert under the NHRBR that would not fall within the definition of medical malpractice and would not be subject to a medical review panel, the supreme court emphasized that any claim of medical malpractice against a qualified health care provider is encompassed within the ambit of the MMA and must be reviewed prior to suit. Richard, supra at 467.
In the instant case, plaintiffs' petition clearly set forth claims of medical malpractice and in fact, the violations found by the trial court cannot be categorized as anything other than acts of malpractice.
In Coleman v. Deno, 01-1517 (La.01/25/02), 813 So.2d 303, 315-316, the supreme court set forth a six-part test to determine whether a negligent act by a health care provider is covered under the MMA: (1) whether the particular wrong is "treatment related" or caused by a dereliction of professional skill; (2) whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached; (3) whether the pertinent act or omission involved assessment of the patient's condition; (4) whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform; (5) whether the injury would have occurred if the patient had not sought treatment; and (6) whether the tort alleged was intentional.
The record does not reflect whether the Glen is a qualified health care provider, and we observe that plaintiffs did not first present their claims against the Glen to a medical review panel nor did defendant object via an exception of prematurity to the civil action. Therefore, as set forth by the court in Barraza v. Scheppegrell, 525 So.2d 1187 (La.App. 5th Cir.1988), the right to review of plaintiffs' claims against the Glen by a medical review panel has been waived. See also Remet v. Martin, 97-0895 (La.App. 4th Cir.12/10/97), 705 So.2d 1132, appeal after remand, 98-2751 (La.App. 4th Cir.03/31/99), 737 So.2d 124. Regardless of the forum, however, the analysis set forth in Coleman, supra, applies.
As noted above, the trial court found that the Glen failed to properly chart, monitor and address Mrs. Reagan's condition, and coordinate her care plan. The court further concluded that these omissions led to ineffective communication with Dr. Borne and resulted in the delayed diagnosis of Mrs. Reagan's colon cancer.
In a malpractice claim against a hospital, or, as in this case, a nursing home, plaintiffs are required to prove by a preponderance of the evidence, as in any negligence action, that: (1) defendant owed plaintiffs a duty to protect against the risk involved (or the applicable standard of care); (2) defendant breached its duty (or the applicable standard of care); and (3) the injury was caused by the breach. La. R.S. 9:2794(A); Bellard v. Willis Knighton Medical Center, 34,360 (La.App.2d Cir.05/09/01), 786 So.2d 218, writ denied, 01-1686 (La.09/21/01), 797 So.2d 676; Gordon v. Willis Knighton Medical Center, 27,044 (La.App.2d Cir.06/21/95), 661 So.2d 991, writs denied, 95-2776, 95-2783 (La.01/26/96), 666 So.2d 679.
It is the duty of a nursing home to provide a reasonable standard of care, taking into account the resident's mental and physical condition. McCartney v. Columbia *730 Heights Nursing Home, Inc., 25,710 (La.App.2d Cir.03/30/94), 634 So.2d 927; Kildron v. Shady Oaks Nursing Home, 549 So.2d 395 (La.App. 2d Cir.1989); McGillivray v. Rapides Iberia Management Enterprises, 493 So.2d 819 (La.App. 2d Cir.1986). This standard of care must take into consideration the fact that nursing home residents have a need to live within the least restrictive environment possible in order to retain their individuality and some personal freedom and preserve their dignity and personal integrity. La. R.S. 40:2010.6; Richard, supra.
A hospital (or nursing home) is responsible for the negligence of its nurses (and other medical personnel) under the respondeat superior doctrine. The Estate of Wilburn v. Leggio, 36,534 (La.App.2d Cir.03/19/03), 842 So.2d 1175, writ denied, 03-1096 (La.06/06/03), 845 So.2d 1095; Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2d Cir.1991); In re Triss, 01-1921 (La.App. 4th Cir.06/05/02), 820 So.2d 1204. The liability imputed to the medical facility is to be viewed in light of the employee' actions. In re Triss, supra; Odom v. State, Department of Health & Hospitals, 98-1590 (La.App. 3d Cir.03/24/99), 733 So.2d 91.
Nurses and other health care providers are subject to the same standard as physicians. Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654 (La.1989); Gibson, supra; In re Triss, supra. It is a nurse's duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of the nursing or health care profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his or her best judgment, in the application of his or her skill to the case. King v. State, through Department of Health and Hospitals, 31,651 (La.App.2d Cir.02/24/99), 728 So.2d 1027, writ denied, 99-0895 (La.05/07/99), 741 So.2d 656; Gibson, supra; In re Triss, supra.
Therefore, under La. R.S. 9:2794, plaintiffs must establish the standard of care applicable to the nursing staff at the Glen, a violation of that standard of care and a causal connection between the nurses' alleged negligence and plaintiffs' injuries resulting therefrom. Pfiffner v. Correa, 94-0924 (La.10/17/94), 643 So.2d 1228; In re Triss, supra. Hindsight or subsequent events cannot be considered when determining whether the actions of the nursing staff were reasonable and met the standard of care. Instead, the professional judgment and conduct of the nurses are evaluated in terms of reasonableness under the then existing circumstances, not in terms of result or in light of subsequent events. In re Abdo, 02-2513, 02-2514 (La. App. 4th Cir.07/09/03), 852 So.2d 513, 2003 WL 21752791, citing Beckham v. St. Paul Fire and Marine Insurance Co., 614 So.2d 760 (La.App. 2d Cir.1993).
Applicable Standard of Care
General Standards for Nursing Homes and Nurses
Linda McWaters, who served as the Director of Nursing at the Glen until 1997-98, at which time she became the Long-Term Care Administrator for the Glen System, testified that she is familiar with the federal and state requirements for long-term care facilities. Furthermore, as a registered nurse, she is knowledgeable about the Louisiana State Board of Nursing legal standards for nursing practice, which are authoritative as standards for nursing in Louisiana regardless of the setting. These standards include data collection and compilation; establishment of nursing goals; formulation of a nursing care plan; evaluation of the care plan; *731 reassessment and modification of the care plan as needed. The standard of care further requires that nurses communicate this information to health care providers, particularly physicians.
Federal regulations require that a registered nurse perform a complete assessment of the patient or resident, as well as formulate a care plan which is to be evaluated and updated quarterly. A team from the various departments, including nursing, pharmacy, dietary, activities, etc., is involved, but the coordinator of the plan must be an R.N.
According to Ms. McWaters, a resident's care plan is inclusive of her entire record, such as the physician's orders, nurses' notes, monthly summaries, etc. There is no requirement which requires monthly charting or summaries; these were done by the Glen's nursing staff in addition to the charting in the nurses' notes. Ms. McWaters reiterated that there are no specific recordkeeping requirements other than that the records must be complete, accurate and systematically organized.
Ms. McWaters testified that, in order to get a true picture of a resident's condition at any given moment, one can't simply look at the care plan and monthly nursing summaries. Instead, reference to the resident's entire chart is proper. In addition to the above documents, the chart includes the nurses' notes and forms and summaries from other disciplines, such as pharmacy, dietary and social services.
Regarding medical diagnosis and treatment, the nursing home staff relies upon the resident's treating physician. In this case, Mrs. Reagan's treating internist was Dr. Alan Borne. As her doctor, Dr. Borne was responsible for staying up-to-speed on Mrs. Reagan's condition and issuing orders to the nursing staff for implementation.
In the nursing home setting, all lab work and testing require a physician's orders. Typically, physicians order annual lab work. Ms. McWaters pointed out that the decision to order annual lab or tests rests entirely within the discretion of the resident's treating physician. The federal regulations require the nursing home to provide lab services on a timely basis and to promptly provide the physician who orders lab work with the results.
Regarding the nursing flow sheets used by the Glen, Ms. McWaters stated that the certified nursing assistants ("C.N.A.") are responsible for documenting activities of daily living, such as bowel movements. Documentation of a bowel movement on the chart, however, requires actual observation by the C.N.A.
Duane King, an R.N. who works weekends at the Glen, reiterated that the standard of care applicable to nurses does not encompass diagnosis; that is strictly within the province of the treating physician. As a nurse in a long-term care setting such as the Glen, his duties include assessing the residents and making these assessments available to the doctors via the residents' charts. It is then the doctor's duty to make decisions regarding diagnosis and appropriate treatment, including the ordering of tests and lab work.
Shelley Hebert, an R.N. who testified as plaintiffs' expert witness, noted that nurses in a rehabilitation or long-term care facility are responsible for setting goals and implementing care plans which are for the lifetime of their patients or residents. Ms. Hebert's credentials include national certification in rehabilitation nursing as well as certification by the Louisiana Department of Health and Hospitals in training nursing assistants who work in nursing homes.
Ms. Hebert testified that nursing standards apply to all nurses, including those *732 who work in nursing homes. A nursing care plan is the method by which an R.N. directs a particular patient's care. The R.N. is the coordinator of this plan, which is a written documentation of nursing diagnoses, interventions and goals. State regulations require use of a nursing care plan in all settings, including nursing homes. Specifically, a care plan must be completed for residents or patients within two weeks of their admission to a long-term care facility such as the Glen. According to Ms. Hebert, a plan should be updated whenever there is a change in a resident's condition.
As did Ms. McWaters, Ms. Hebert enunciated the applicable standard for nurses, which includes: data collection and the establishment of goals; setting of priorities and determination of nursing actions to achieve the goals set; provision for nursing interventions; implementation of the plan and documentation by written records; and reevaluation. Ms. Hebert noted that this process is continuous.
On cross-examination, Ms. Hebert agreed with the other nurse-witnesses that it is the treating physician's duty to diagnose medical conditions.
Defendant presented the testimony of Kathleen Shoup, an R.N. whose credentials include serving as a trainer for certified nursing assistants in the nursing home setting and working for the Department of Health and Hospitals as a licensing and certification surveyor of nursing home facilities.
Ms. Shoup stated that state regulations for nursing homes require that their clinical records contain sufficient information to identify the resident and provide a record of the resident's assessments, the plan of care and explanation of services provided, and progress notes, as well as the results of any pre-admission screening conducted by the state.
Regarding lab work, the state regulations applicable to nursing homes require that the facility provide or obtain laboratory services only when ordered by the resident's attending physician.
Specific Standard for Treatment/Documentation of Constipation
Ms. McWaters testified that constipation is a common condition in nursing home residents, even more so for residents with Alzheimer's/dementia. In fact, constipation is the most common problem nursing residents experience. Constipation in and of itself is not necessarily indicative of colon cancer. Some of the warning signs for colon cancer include significant weight loss, significant change in eating habits/food intake, noticeable behavioral changes, significant change in bowel habits and rectal bleeding. Ms. McWaters stated that in many cases these symptoms do not become manifest until the very late stages of colon cancer.
Another condition that is occasionally experienced by elderly residents, particularly those suffering from Alzheimer's/dementia, is a distended abdomen. According to Ms. McWaters, this is caused by a decrease in metabolism and bowel motility, as well as a lower level of physical activity.
Ms. McWaters testified that for a resident with Alzheimer's, such as Mrs. Reagan, who has problems with regularity of her bowel movements, the care plan provides for nursing assistants to remind (or assist) the resident every two hours to use the restroom. Again, the nursing assistants are only to document bowel movements they personally observe. For a resident who is semi-independent, as was Mrs. Reagan, the goal is that she take care of as many of her activities of daily living as possible. This includes using the restroom by herself.
*733 Ms. McWaters stated that it is not unusual for there to be few or no bowel movements documented in a resident's chart and that this is definitely not a "red flag," when other factors, such as Alzheimer's/dementia disease process, no significant change in eating habits, frequent independent use of bathroom facilities and no significant change in behavior, are considered.
Treatments for constipation include use of laxatives, such as Milk of Magnesia, stool softeners, such as Colace, application of enemas, as well as an increase in fiber intake and physical activity. According to Ms. McWaters, constipation is a symptom, not a disease. Nonetheless, it requires a doctor's orders, which can be given on an "as needed" basis, to treat with medication. As a rule of thumb, if a patient or resident fails to have a bowel movement for three days, the cause needs to be determined and addressed.
Ms. Hebert agreed that constipation is a symptom, not an illness, which needs to be addressed or provided for in a resident's care plan. As opposed to illnesses or diseases, nurses can and should diagnose and treat specific symptoms. There are a number of things which nurses can do to alleviate constipation, none of which require a doctor's orders, such as increasing fluid intake, increasing fiber consumption and maintaining a closer monitoring of bowel habits.
Ms. Hebert noted that constipation is not in and of itself indicative of colon cancer. Other early warning signals for cancer detection that can be readily observed by nurses include changes in bowel or bladder habits, significant weight loss and changes in behavior.
Breach of the Standard of Care
Ms. McWaters testified that no one at the Glen was aware that Mrs. Reagan had colon cancer until her diagnosis by Schumpert on July 3, 1996. The cancer was stage II, having spread to the fatty tissue surrounding the colon. The primary tumor was located where the large and small intestine connect. Mrs. Reagan's chart indicates that she was active and walking around the Glen until the last few days before her admission to the hospital. Ms. McWaters noted that Mrs. Reagan's activity primarily involved wandering, due to her mental confusion.
Although Mrs. Reagan had Alzheimer's type dementia, she was able to remember some things and could go to the bathroom by herself. Keeping in mind the goal of individual independence and dignity, Mrs. Reagan's care plan was that every two hours, a nursing assistant would remind her to go to the bathroom. This was done, asserts Ms. McWaters, but a lot of the time Mrs. Reagan used the restroom facilities on her own.
The Glen records indicate that Mrs. Reagan was first given medication for constipation in June 1995. At that time, one of the nurses called Dr. Borne, Mrs. Reagan's doctor, who ordered on an "as needed" basis Milk of Magnesia, a laxative. Prior to June 1995, there were no complaints of constipation, although constipation was listed in Mrs. Reagan's chart as a side effect associated with medication she was taking for Alzheimer's disease. Beginning in September 1995, the nurses' notes indicate that Mrs. Reagan would wander when she was constipated. Dr. Borne was again contacted regarding Mrs. Reagan's constipation in September 1995. At that time, he added a stool softener, Colace, to be administered as needed. Furthermore, Dr. Borne requested that the nurses call him whenever Mrs. Reagan had three doses of Milk of Magnesia without effect.
*734 Mrs. Reagan's chart indicates that prior to her hospitalization in July 1996, her last annual lab was performed in February 1995. At that time, she was not experiencing constipation problems. When asked why no annual lab was done in February 1996, Ms. McWaters reiterated that they were unable to do lab except pursuant to a doctor's orders.
According to Ms. McWaters, Mrs. Reagan's chart reflects that she began experiencing occasional episodes of constipation in June 1995. Ms. McWaters conceded that very few of Mrs. Reagan's bowel movements were documented. This doesn't mean, however, that she was not having them. Instead, what the absence of documentation denotes is that the movements were not observed or witnessed by the nursing assistants. Again, the nursing assistants only chart what they personally see. The chart indicates that Mrs. Reagan was using the bathroom by herself (or having accidents on the floor or in the trash can), wasn't losing weight and was eating the same amount of food. Mrs. Reagan had a toilet by her bedside during the night and used the hall facilities during the day time, most often on her own. Had Mrs. Reagan not had bowel movements, as the flow charts could be interpreted to reflect, she would have gotten worse in a matter of days. This did not happen.
Dr. Borne visited Mrs. Reagan on October 4,1995, one day after the nurses' notes indicate that she was constipated and suffering from a distended abdomen. Thereafter, on October 12, 1995, Mrs. Reagan had a distended abdomen and her clothing was tight. The nurses' notes indicate that she had active bowel sounds in all quadrants (indicating no blockage) and that Milk of Magnesia was given. At that point, Mrs. Reagan's chart did not show a pattern or trend to her constipation, which Ms. McWaters categorized as "sporadic." Ms. McWaters again emphasized that constipation is only one of the things they look for to determine whether anything of a more serious pathology was occurring. Other factors, such as eating habits, weight and behavior, are just as critical. Mrs. Reagan's chart did not indicate any significant changes in these areas.
Going through Mrs. Reagan's chart for November and December 1985, Ms. McWaters noted that, given Mrs. Reagan's daily medications, dementia and age-related changes, it was not unusual for her to experience constipation. Dr. Borne was seeing her on a regular basis and was fully cognizant of Mrs. Reagan's condition, including her bouts of constipation.
Although Ms. McWaters felt that Mrs. Reagan's constipation should have improved by December 1995, the fact that it did not was most probably related to the medications she was taking, as well as her disease process and advancing age. Contrary to plaintiffs' witness's contention, the care plan did address Mrs. Reagan's constipation by providing for toileting every two hours, administration of Milk of Magnesia and Colace, as well as increasing fluid intake. Entries in Mrs. Reagan's record for December 1995 indicate that she was eating regularly, sleeping through the night and able to go to the bathroom alone if reminded.
Notwithstanding entries in Mrs. Reagan's chart in 1996 regarding episodes of constipation, Ms. McWaters felt that there was never a trend or pattern to her inability to produce a bowel movement such that the nursing staff should have been alerted to the fact that Mrs. Reagan had colon cancer. Again, there were no significant changes in Mrs. Reagan's weight or food intake. In fact, Mrs. Reagan's appetite remained consistent until July 1996, the month that she was hospitalized and her colon cancer was discovered.
*735 Toward the end of June 1996, Mrs. Reagan's chart indicates that she began sleeping more, became less active and involved, and was agitated and confused. On June 30, 1996, Mrs. Reagan became weak and fell on her way to the dining room. As a result, Dr. Borne ordered lab work and CBC tests, which revealed anemia and caused him to order occult blood testing, which revealed the presence of blood in her stool and indicated a more serious pathology. At that point, she was hospitalized and diagnosed with state II colon cancer.
Ms. McWaters noted that Dr. Borne would visit Mrs. Reagan once a month or once every two months and that he had access to all of Mrs. Reagan's chart, not just the care plan. Usually, an L.P.N. (licensed practical nurse) would make the rounds with Dr. Borne, inasmuch as they were more up-to-speed on the resident's daily condition and were better able to communicate any changes or abnormalities. Like annual lab work, occult blood testing is never done unless it is ordered by a resident's treating physician.
Ms. Hebert, on the other hand, testified that the nurses deviated from the standard of care in this case by failing to monitor Mrs. Reagan, coordinate her care plan and chart and present a full clinical picture to Dr. Borne, all of which led to a delay in the discovery of Mrs. Reagan's colon cancer.
According to Ms. Hebert, she noticed a problem with constipation in Mrs. Reagan's chart beginning in June 1995. The chart reflects that Dr. Borne was notified and medication was ordered. Although conceding that constipation was provided for in Mrs. Reagan's care plan, Ms. Hebert felt that it should have been listed under "conditions" in September 1995, inasmuch as problems had been noted and medication was being given for constipation.
By September 1995, because none of the medical interventions were successful, it was time for reevaluation of Mrs. Reagan's care plan vis-a-vis the constipation. This would have made the nursing staff aware that Mrs. Reagan was not getting better and that it was time to call the doctor again. Ms. Hebert acknowledged that the chart reflects that Dr. Borne was in fact made aware of Mrs. Reagan's continued complaints in September 1995 by the nursing staff and that additional medication was prescribed.
Ms. Hebert opined that Mrs. Reagan's chart presented a continual trend of problems that the nursing staff should have picked up on, such as repeated bouts of constipation and related behavioral changes, such as agitation and confusion. Contrary to Ms. McWaters' testimony, Ms. Hebert felt that the record showed a trend of worsening constipation up until Mrs. Reagan's diagnosis of colon cancer.
On cross-examination, Ms. Hebert testified that in 1995-96, Mrs. Reagan's chart indicated that she was exhibiting definite signs of dementia consistent with her Alzheimer's disease, such as agitation and wandering. Ms. Hebert conceded that the wandering and agitation were both documented in Mrs. Reagan's chart, as was the fact that these behaviors occurred whenever she was constipated. These are things that Dr. Borne could have seen during his review of Mrs. Reagan's chart.
Ms. Hebert also stated that as a registered nurse, she has never unilaterally administered a blood occult screening test and that the Glen did nothing wrong by not performing such a test on Mrs. Reagan without an order from her treating physician.
Mrs. Reagan's chart reflects that Dr. Borne ordered Milk of Magnesia for constipation and that he made notes to that effect almost every month. The record *736 reflects that he checked his own notes in the chart every month and signed orders for Mrs. Reagan's care as well. Ms. Hebert noted that she did not know what Dr. Borne reviewed when he examined a resident's chart, nor does she know what his practice was in speaking with the nursing staff or examining the residents.
Ms. Hebert agreed with Ms. McWaters that constipation is a common malady among the elderly and that constipation is a symptom, not a disease. The rule of thumb is that there should be a bowel movement every three days; a bowel movement less than twice a week signifies a problem, she explained.
Ms. Hebert then testified that Mrs. Reagan's severe constipation was reflected in her chart at the Glen. According to Ms. Hebert, Dr. Borne could have determined further treatment for Mrs. Reagan's constipation had he looked at her chart inasmuch as the repetitive problems she had were clearly documented in her chart. Ms. Hebert then stated that there was nothing which should have prevented Dr. Borne from knowing about Mrs. Reagan's constipation.
Ms. Shoup testified that she reviewed Mrs. Reagan's chart for the period 1995-96 and found no violation of the applicable standards of care by the nursing home or its nursing staff. Specifically, Ms. Shoup stated that the Glen did not violate any of Mrs. Reagan's rights, particularly those of dignity, personal integrity and self-determination.
Furthermore, given her treating physician's diagnoses of Alzheimer's and dementia, as well as his standing orders for Milk of Magnesia as needed for constipation, she can only conclude that Dr. Borne was aware of Mrs. Reagan's constipation problem. As noted by the other expert witnesses, it is the physician's responsibility to review a resident's medications and plan of care and to be aware of the contents of a resident's chart. Ms. Shoup reiterated that diagnosis is the doctor's responsibility.
Testimony of Dr. Chris Rheams
In addition to the above nursing experts, in their attempt to establish liability on the part of the Glen, plaintiffs introduced the testimony of Dr. Chris Rheams, an internal medicine specialist who served on the medical review panel that exonerated Dr. Alan Borne.[3]
Dr. Rheams stated that colon cancer is a very silent disease, for the most part. In most cases, tumors in the colon will not bleed until the latter stage of the disease, nor will they obstruct the intestines early enough so that they can be surgically removed. According to Dr. Rheams, by the time someone has symptoms indicative of colon cancer, all too often the disease is in the latter stages.
Dr. Rheams testified that there is no hard and fast rule regarding annual lab work such as CBC testing. Instead, every physician is different. For Dr. Rheams, the decision to order lab work is individualized per patient.
In reviewing Mrs. Reagan's chart, Dr. Rheams noted that she was 82 years old, had intermittent constipation, sometimes had a distended abdomen and wandered and experienced mood changes when constipated. Had he been her physician, he would have concluded that all of these were symptoms related to her Alzheimer's disease. According to Dr. Rheams, all persons with Alzheimer's suffer from constipation. Treatment for constipation includes *737 increased physical activity, a high fiber diet, use of stool softeners, laxatives, suppositories and enemas.
When asked whether Mrs. Reagan's care-givers at the Glen should have known there was more going on than constipation, Dr. Rheams stated that the fact that she had colon cancer could only have been known in retrospect after the colonoscopy. Dr. Rheams couldn't opine whether Mrs. Reagan's symptoms were enough to indicate colon cancer as a possible diagnosis to Dr. Borne, nor would he offer an opinion that earlier diagnosis and intervention would have changed the outcome. Dr. Rheams was also unable to state how long the tumor had been there prior to its discovery. According to Dr. Rheams, more likely than not, the tumor was there one year before it was found. However, he stated that the likelihood of the tumor causing symptoms was very doubtful. In his words:
Certainly, those symptoms [abdominal distension, constipation] bring up the question, and there's noI mean, that's on the list of things that cause those symptoms ... [I]t's easy to see in retrospect that this person had symptoms and that they probably were referable to the colon cancer. But if you were to take a hundred 82-year-olds with Alzheimer's and look at their abdominal function, you would have to scope all of them.
On cross-examination, Dr. Rheams reiterated that it is the job of the treating physician, not the nursing home, to order tests, inasmuch as it is the doctor who is responsible for diagnosis of illnesses. Nurses are not qualified to diagnose diseases or illnesses. After reading Mrs. Reagan's chart, had he been her treating physician, in light of her age, Alzheimer's disease, medications and constipation, he too would have treated her symptomatically.
Dr. Rheams noted that Mrs. Reagan's chart from the Glen contained many notes regarding constipation and its treatment with laxatives and stool softeners. He felt, however, that there were some inaccuracies in the charting of Mrs. Reagan's bowel movements, which was to be expected. Nonetheless, Dr. Rheams was adamant that the flowsheets and record as a whole did not indicate a trend or red flag to the nurses or to Dr. Borne.
Dr. Rheams also testified that the practice of annual lab would not have affected Mrs. Reagan's outcome; she still would have required surgery had the detection process begun a few months earlier (in February 1996 as opposed to July 1996). Actually, Dr. Rheams felt that the outcome could have been the same had the lab work been done in August 1995, almost an entire year earlier. According to Dr. Rheams, because the tumor was slow growing, the timing of the intervention was not critical.
Analysis
Plaintiffs bore the burden of proving by a preponderance of the evidence that the Glen and its staff deviated from the applicable standard of care in their treatment of Mrs. Reagan and that this breach caused or contributed to her injuries. Quite simply, we find that the evidence introduced by plaintiffs is insufficient to bear this burden and that the trial court erred in finding otherwise.
Prevalent through the testimony of all of the expert witnesses in this case is the primary distinction between the roles of physician and nurse. The responsibility for diagnosis, including the decision to further investigate through lab work and other tests, is unmistakably that of the treating physician, not a nursing home or its nursing staff. On the other hand, it is the *738 duty of the nurses involved in the daily care of nursing home presidents to communicate details of the residents' conditions to their doctors, which is primarily done through entries and documentation in the residents' charts.
We agree with the trial court that Mrs. Reagan's bowel movements were rather haphazardly charted by the nursing home staff. We find, however, no causal connection between the nursing staff's failure to document all of Mrs. Reagan's bowel activity and the delayed diagnosis of her colon cancer. The evidence instead establishes that Mrs. Reagan's constipation was appropriately documented and addressed by the nursing staff and that Dr. Borne was fully attuned to the situation. Even Ms. Hebert, plaintiffs' expert witness, stated that the fact that Mrs. Reagan suffered from chronic constipation was adequately documented in her chart, which was available for review by her doctor each time he visited with her. The evidence also shows that Dr. Borne, who was not called as a witness by plaintiffs, in fact knew that Mrs. Reagan had chronic constipation. The record reveals that Dr. Borne visited Mrs. Reagan on a regular basis, every month or two, issued standing orders to administer Milk of Magnesia (June 1995) and Colace (August 1995) as needed and noted her chronic constipation upon her admission to Schumpert in July 1996.
The failure to discern the fact that Mrs. Reagan was suffering from colon cancer cannot be laid upon the shoulders of the Glen or its nurses. If anyone should have been able to determine that more was going on than the aging process, progression of her Alzheimer's disease or side effects from her medication, it would have been Dr. Borne, Mrs. Reagan's treating internist. That determination, however, is not for us to make, inasmuch as Dr. Borne got out of the case via a favorable summary judgment ruling.

Conclusion
For the reasons set forth above, the trial court's judgment is REVERSED.

APPLICATION FOR REHEARING
Before BROWN, C.J. GASKINS, CARAWAY, DREW, and TRAYLOR, JJ.
Rehearing denied.
NOTES
[1] By a later amendment, plaintiffs added a medical malpractice claim against Dr. Alan Borne, Mrs. Reagan's treating internist, after a medical malpractice review panel rendered an opinion favorable to Dr. Borne. Plaintiffs' claim against Dr. Borne was dismissed by the trial court on summary judgment; this ruling was affirmed by this court in Hinson v. Glen Oak Retirement Home, 34,281 (La.App.2d Cir. 12/15/00), 774 So.2d 1134.
[2] Because we are reversing the judgment of the trial court on substantive grounds, we do not reach the various procedural and evidentiary issues raised by defendant. We will, however, point out that upon Mrs. Reagan's death La.C.C. art. 2315.1(A)(1) provides that the right to recover damages for her injuries survived for one year from her death in favor of her children (emphasis added). In the instant action, plaintiffs are only two of Mrs. Reagan's ten surviving children, one son having predeceased her. The other eight children are arguably indispensable parties, in whose absence the action should not have proceeded.
[3] Notably absent from plaintiffs' roster of witnesses who testified at trial was Dr. Borne himself.