938 So.2d 1092 (2006)
Sarah Jane BALL, Individually and as the Surviving Wife of Robert L. Ball, Jr., Plaintiff-Appellant
v.
CHARTER FOREST BEHAVIORAL HEALTH SYSTEM, INC. d/b/a Charter Forest Hospital and Richard W. Williams, M.D., in Solido, Defendant-Appellees.
No. 41,329-CA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 2006.
Rice & Kendig by William F. Kendig, Shreveport, for Appellant.
Walter F. Clawson, Shreveport, for Appellees.
Before WILLIAMS, CARAWAY and MOORE, JJ.
MOORE, J.
Sarah Jane Ball appeals a jury verdict that rejected her claims for wrongful death and survival damages against the Louisiana Patients' Compensation Fund ("PCF"). Mrs. Ball alleged that her husband, Robert Ball Jr., sustained fatal head injuries shortly after being admitted to Charter Forest Behavioral Health System ("Charter Forest") for chemical dependency treatment in July 1998. Evidence showed that Mr. Ball was trying to bolt from the facility when he suffered a grand mal seizure and fell to the floor, severely injuring his head. The jury found that Charter Forest did not breach the applicable standard of care, and we now affirm.

Factual Background
The 53-year-old Robert Ball had been a serious alcoholic for many years. He met the future Mrs. Ball in 1996 and they got married in May 1998, about two months before he died. It was Mrs. Ball's fourth marriage. At her insistence, Robert had stopped drinking but he soon lapsed. She insisted that he get treatment, but he was apprehensive and resistant. On July 13, 1998, she drove him to Charter Forest, *1094 where he agreed to only a "partial inpatient" admission which failed; he went home and got drunk again. The next morning, July 14, she again took him to Charter Forest; fearful and apprehensive, Robert drank two beers along the way.
According to Charter Forest's records, the Balls arrived about 10:30 AM and met with a counselor for about 30 minutes. They then met with Dr. Richard Williams, a psychiatrist and certified addiction physician, for about 45 minutes. Dr. Williams saw that Robert was shaking, sweating and agitated  all symptoms of withdrawal. Dr. Williams and Mrs. Ball finally persuaded Robert to be admitted as an inpatient. At 11:45, they walked him to the nurses' station, where Nurse Laughlin sat him down at the vital signs machine. Dr. Williams ordered a dose of 25 mg Librium to ease the effects of withdrawal. At trial, several witnesses (including Nurse Laughlin) discussed this dosage and whether it was unusually low; however, Dr. Williams felt it was an appropriate initial dosage.
After Nurse Laughlin gave Robert the pill, Dr. Williams left to complete his rounds and Mrs. Ball went outside to fetch some of her husband's toiletries from the car; she lingered a few minutes to smoke a cigarette. Nurse Laughlin testified that alone with Robert, she knelt beside his chair, made good eye contact and reassured him that the medicine would help him to start feeling better. She thought they established a good rapport. At 11:55, however, she got his vital signs: blood pressure "172/118 (and elevating)" and pulse "126 (irregular)." Thinking that Robert was in much more acute withdrawal than Dr. Williams had realized, Nurse Laughlin decided to call the doctor and ask for additional medication. She testified that she told Robert, "I want you to stay here in this chair and allow the Librium to work," and he nodded in apparent understanding. She then left his side and took three steps around the counter, some seven feet away, to phone Dr. Williams.
After she dialed the number, she saw in the corner of her eye that Robert had risen from the chair and was hustling down the curved hallway, going toward the main entrance. She shouted at him to come back, dropped the phone and ran in pursuit. Once she rounded the hall, she saw Robert lying face-up on the floor, having a seizure. She depressed his tongue and called for assistance, but he soon went into a grand mal seizure.
Robert was promptly carried to Highland Hospital and operated on by Dr. David Cavanaugh, but he died the next day. Dr. George McCormick, the late coroner for Caddo Parish, performed an autopsy, concluding that Robert died from closed head injuries received when the back of his head struck the floor. He and Dr. Cavanaugh excluded stroke or any other cause of death.
Mrs. Ball filed the instant suit in July 1999 against Charter Forest and Dr. Williams, alleging that both breached the applicable standards of care in various ways. A medical review panel found that Dr. Williams and Charter Forest breached the standard of care by failing to admit Robert when he first appeared on July 13, but made no finding as to Nurse Laughlin's conduct on July 14. In late 2002, Mrs. Ball settled with Dr. Williams and Charter Forest (by then known as Brentwood Hospital) for $75,000, reserving all rights against the PCF. The PCF prayed for a jury trial, which was held over four days in late June 2005.
The 12-member jury deliberated one hour before unanimously deciding that neither Charter Forest nor any of its employees deviated from or violated the standard of care owed to Robert. The district court *1095 rendered judgment in accordance with the verdict, dismissing Mrs. Ball's claims. She took this appeal.

Applicable Law
In a malpractice claim against a hospital or, as in this case, a chemical dependency facility, the plaintiff is required to prove by a preponderance of the evidence, as in any negligence action, that defendant owed plaintiff a duty to protect against the risk involved (or the applicable standard of care), defendant breached its duty (or the applicable standard of care), and the injury was caused by the breach. La. R.S. 9:2794 A; Pfiffner v. Correa, 94-0992 (La. 10/17/94), 643 So.2d 1228; Hinson v. The Glen Oak Retirement Syst., 37,550 (La.App. 2 Cir. 8/20/03), 853 So.2d 726, writ denied, 2003-2835 (La.12/19/03), 861 So.2d 572.
Nurses and other health care providers are subject to the same standard as physicians. Cangelosi v. Our Lady of the Lake Regional Med. Center, 564 So.2d 654 (La.1989); Hinson v. The Glen Oak, supra. The nurse's duty is to exercise the degree of skill ordinarily employed, under similar circumstances, by members of the nursing or health care profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his or her best judgment, in the application of his or her skill to the case. Hinson v. The Glen Oak, supra, and citations therein.
Injury alone does not raise a presumption of negligence. La. R.S. 9:2794 C; Campo v. Correa, 2001-2707 (La.6/21/02), 828 So.2d 502; Fluck v. Coffman, 37,739 (La.App. 2 Cir. 12/12/03), 862 So.2d 1105. Hindsight or subsequent events cannot be considered when determining whether the actions of the nursing staff were reasonable and met the standard of care. Instead, the professional judgment and conduct of the nurses are evaluated under the then existing circumstances, not in terms of result or in light of subsequent events. Hinson v. The Glen Oak, supra, and citations therein.
The jury's finding in a medical malpractice case is subject to manifest error review: it cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Salvant v. State, 2005-2126 (La.7/6/06), 935 So.2d 646; Jackson v. State, 39,759 (La.App. 2 Cir. 6/29/05), 907 So.2d 250. In order to reverse the jury's finding of fact, the appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Salvant v. State, supra. The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Id.; Pinsonneault v. Merchants & Farmers Bank & Tr. Co., 2001-2217 (La.4/3/02), 816 So.2d 270. Where there are two permissible views of the evidence, the jury's choice between them cannot be manifestly erroneous or plainly wrong. Id.

Discussion
By her first assignment of error, Mrs. Ball urges the jury erred in finding no breach of the standard of care. She concedes that the manifest error standard applies, but argues that the appellate court will reverse a jury verdict of no liability when it appears the verdict was unduly influenced by the doctor's depiction as a "good person." Walker v. Corsetti, 04-784 (La.App. 5 Cir. 3/29/05), 900 So.2d 991, writs denied, XXXX-XXXX, -1110 (La.6/17/05), 904 So.2d 700, 702. To establish the standard of care, she cites Dr. Williams's own statement in deposition:

*1096 A patient that I believe is going through withdrawal needs to be watched. They need to be sitting down or lying down. I wouldn't want them standing up and walking around. The typical protocol for how a nurse would handle a situation would be to sit them down, get their history, take their blood pressure, put them in a bed closest to the nurse's station where they can watch them, come check on them every 15 minutes.
She notes that her own expert witness in addiction medicine, Dr. Nancy Johnson, expressly agreed with Dr. Williams's formulation; Dr. James Phillips, a psychiatrist who served on the medical review panel, called it a "fairly good standard"; and the PCF's expert psychiatrist and physiologist, Dr. George Seiden, essentially agreed, adding only that the patient should eventually be put in the nearest bed.
Mrs. Ball then contends that Nurse Laughlin breached this standard by leaving Robert unattended at the nurses' station, allowing him to wander off. Mrs. Ball argues it was unnecessary for Nurse Laughlin to call the doctor so soon, as all witnesses agreed the Librium would not kick in for 20 to 30 minutes; there was a phone right there on the counter, which she could have used without leaving the patient's side; and even if she felt the need to phone the doctor, she could have called another nurse to sit with Robert while she (Nurse Laughlin) paged him. Mrs. Ball also disputes Nurse Laughlin's testimony that she instructed Robert to stay seated, and argues that even if she did so, a patient in his condition could not be expected to heed her directive. She concludes that Nurse Laughlin "had only one job during the 5-7 minutes Mrs. Ball was walking to and from her car: stay with Mr. Ball and make sure he remained seated or lying down so that he was not up walking around," and she breached it.
Finally, Mrs. Ball contends that this breach caused her husband's death, citing expert testimony that patients experiencing acute withdrawal are much more subject to seizures than the average population. She also shows that in a grand mal seizure, the patient loses consciousness and cannot break his fall. Had Robert been sitting in the chair or moved to a bed, he would not have sustained the severe concussion and contrecoup frontal injury identified by Drs. McCormick and Cavanaugh as the cause of death.
The PCF responds by citing the manifest error rule and submits that Walker v. Corsetti, supra, is distinguishable in that Dr. Corsetti admitted a series of mistakes. The PCF urges that Nurse Laughlin complied with the standard of care by giving Robert the Librium as directed by Dr. Williams, kneeling next to him and constantly reassuring him; however, his vital signs were still high and he still appeared nervous, so she thought he urgently needed more medication. Robert appeared to understand when she told him to stay put while she made a phone call to help him, replying he felt "lucky to be in this chair," but in an flash he got up and hurried down the hall. The PCF urges this was an act of his own volition, not the result of any negligence on Nurse Laughlin's part. It submits that "moving seven feet from immediately adjacent to Mr. Ball to telephone within the nurses' station, where she maintained an unobstructed view of Mr. Ball," did not constitute leaving him unattended.
The PCF also shows that both Dr. Seiden and Dr. Phillips found in Nurse Laughlin's conduct no deviation from the standard of care; citing their testimony, the PCF urges that the alternative of moving Robert to a room to lie down would have *1097 been even more intimidating and was inadvisable. It concludes the verdict was reasonable and should not be disturbed.
We agree with the PCF's reading of Walker v. Corsetti, supra: there, the defendant doctor admitted "a series of misidentifications during the laparoscopic cholecystectomy procedure," thus undermining the jury's apparent finding that the plaintiff suffered "simply a case of a recognized complication." There is no such admission of error in the instant case; all witnesses agreed Nurse Laughlin was an experienced and competent nurse. There is no suggestion that the PCF unfairly misrepresented her as a "good person" in the effort to depict Robert as bad or Mrs. Ball as unworthy. We perceive no impropriety.
Mrs. Ball relied almost exclusively on one passage from Dr. Williams's deposition to argue that the nurse could not leave the patient's side under any circumstances. Dr. Johnson fully endorsed this formulation of the standard of care, finding that Robert needed the "closest observation," especially in the first hour, and that Nurse Laughlin plainly breached this standard.
There was, however, abundant record evidence from which the jury could infer that this formulation of the standard of care was incomplete. Even Dr. Williams, on cross examination, admitted that if the patient had Robert's vital signs, it was appropriate for the nurse to notify the treating physician. He declined to agree that Nurse Laughlin should not have moved seven feet away to place the call. Dr. Seiden testified that he would want to be informed about the patient's vital signs, if they were as elevated as Robert's, and that he would expect the nurse to convey these to him. He did not conclude that Nurse Laughlin breached the standard of care by going to a phone seven feet away. Dr. Phillips testified that the patient walked in on his own strength, suggesting to Nurse Laughlin that his situation was not severe, but when she independently assessed him and saw his very elevated vital signs, she attempted to relay this to the treating physician. He felt she did not breach the standard of care.
In short, the standard of care appears to encompass a duty to notify the treating physician of any unusual vital signs; on this record, Nurse Laughlin appears to have assessed the patient properly and made a reasonable effort to notify Dr. Williams.
Mrs. Ball further argues that even if Nurse Laughlin really needed to contact Dr. Williams, she should have done so differently. She suggests that Nurse Laughlin could have summoned another nurse or aide to stay with Robert while she phoned Dr. Williams, but Nurse Laughlin testified that nobody else was in the immediate area at the time. She also suggests that Nurse Laughlin could have moved him to a bed in a nearby room, but Drs. Seiden and Phillips both testified that without the application of physical restraints, which were impermissible with a voluntary patient, even placing him in a bed would not have prevented Robert from getting up and running away. Mrs. Ball finally suggests that Nurse Laughlin's testimony is simply not credible insofar as she claimed to tell Robert to stay in the chair while she made a phone call, as her nurses' notes do not include this detail. However, the jury was fully aware of the discrepancy between the testimony and the nurses' notes, and chose to accept her testimony. We will not disturb their reasonable credibility call. Salvant v. State, supra; Pinsonneault v. Merchants & Farmers Bank & Tr. Co., supra.
The record convinces us that events unfolded very quickly at 11:55 AM at Charter Forest that day. With the benefit of hindsight, *1098 we can theorize that a more perspicacious nurse could have anticipated that Robert, with his aversion to seeking treatment and his high anxiety, was a risk to bolt and run. On the other hand, Nurse Laughlin stayed at his side for several minutes, trying to calm him; when she found his vital signs alarmingly high, she asked him to remain seated and walked a very short distance to phone the doctor. The jury found this conduct did not deviate from the standard of care, and on this record we cannot say the jury was plainly wrong.
By her second assignment of error, Mrs. Ball urges the jury erred in not reaching the issue of damages. In light of our finding with respect to liability, we pretermit any discussion of damages.

Conclusion
For the reasons expressed, the judgment is affirmed. Costs are to be paid by the appellant, Mrs. Sarah Jane Ball.
AFFIRMED.